UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRIAN VALENTI, on his own behalf and on behalf of a class of those similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:15-cv-1304-WTL-TAB |
| INDIANA SECRETARY OF STATE, in her official capacity; THE INDIVIDUAL MEMBERS of the INDIANA ELECTION COMMISSION, in their official capacities; THE SUPERINTENDENT of the INDIANA STATE POLICE, in his official capacity; THE BLACKFORD COUNTY PROSECUTOR, in his official capacity, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff, Brian Valenti, challenges, Indiana's sex offender statute, Indiana Code Section 35-42-4-1-4, as an unreasonable burden upon his right to vote in violation of his rights under the First and Fourteenth Amendments of the United States Constitution. Defendants now request the Court grant summary judgment in their favor as there is no genuine dispute of material fact and Defendants are entitled to judgment as a matter of law. Plaintiff's right to vote has not been unreasonably burdened under Indiana law and Plaintiff may still exercise his voting rights in a manner valid under the Constitution.

## I. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Plaintiff is a registered voter currently living in Hartford City, Blackford County Indiana. (ECF 28, ¶ 10; Deposition of Brian Valenti, p. 16:7-9.) Plaintiff lives at 522 E Main Street, Hartford City, IN 47348. (Valenti Dep., p. 15:1-2.) He received his Indiana driver's license after taking the written driver's exam five times. (Valenti Dep., p. 29:2-19.) He is presently confined at the Blackford County Jail on a charge of battery resulting in bodily injury. (Valenti Dep., pp. 7:12-8:24.)

Prior to moving to Hartford City, Plaintiff was convicted of "Lewd or Lascivious Acts with Child Under 14 Years" in 1988 in California and served a sentence of ten years in the California corrections system. (ECF 28, ¶ 21; Valenti Dep., p. 11:1-23.) This prior conviction required Plaintiff to register as a sex offender in Indiana upon his move to Blackford County in 2014. (ECF 28, ¶ 23-24.) Plaintiff's prior conviction also brought him under the definition of "serious sex offender" as defined in Indiana Code Section 35-42-4-14(a).

Subsection (b) of the same statute provides that "[a] serious sex offender who knowingly or intentionally enters school property commits unlawful entry by a serious sex offender, a Level 6 felony." Ind. Code § 35-42-4-14(b).

Upon Plaintiff's move to Blackford County, he decided to register to vote in late 2014. (Valenti Dep., p. 16:7-9.) Prior to registering in Indiana, Plaintiff had never been registered to vote in the United States, nor had he voted in any elections. (Valenti Dep., pp. 18:4-9, 19:15-20:1.)

Blackford County has two vote centers where any registered voter may vote on Election Day: one at the Blackford County High School Auxiliary Gym ("High School") and another at the Montpelier Civic Center. (ECF 28, ¶ 26; ECF 51, ¶ 26); *see also* http://www.in.gov/sos/elections/3574.htm (last visited December 14, 2016). The High School is located at 2392 N. SR 3, Hartford City, IN. (Blackford County Vote Center Plan, Exhibit A, p. 3, *available at* http://www.in.gov/sos/elections/3574.htm (last visited December 14, 2016)). The Montpelier Civic Center is located at 339 S. Main Street, Montpelier, IN. (Ex. A, p. 3.) The High School is approximately three miles away from Plaintiff's home, while the Montpelier vote center is closer to twelve miles away, according to Plaintiff. (ECF 28 ¶ 30, 32.) Plaintiff may not enter the High School to vote without violating Indiana Code Section 35-42-4-14(b). (ECF 28 ¶ 29; ECF 51, ¶ 29.) However, any voter in the county may vote at the vote center located in Montpelier. (ECF 28 ¶ 26.)

Plaintiff alleges that voting at the Montpelier vote center is insufficient because he claims he does not have a vehicle suitable to travel there, most Hartford City voters vote at the High School, and he likes to converse with them about public issues prior to voting. (ECF 28. ¶¶ 27, 31, 36; Valenti Dep. pp. 22:7-19, 29:22-30:11, 36:3-14.) In addition, Plaintiff argues he cannot meet local candidates that campaign at the High School on Election Day. (ECF 28. ¶¶ 28, 33-35; Valenti Dep. pp. 40:23-41:25.)

Plaintiff, however, has testified that local campaigns have campaigned on his street and visited him at his own home. (Valenti Dep., pp. 41:8-15.) Plaintiff also owns two vehicles: a 1991 Ford F350 which he has been unable to obtain valid title to and a

1997 Chevy Cavalier. (Valenti Dep., pp. 29:20-31:21.) The Cavalier runs and drives fine, but has a knock when started. (Valenti Dep., pp. 31:22-32:10.) Plaintiff wants to get the knock looked at by a mechanic. (Valenti Dep. p., 32:11-19.) Plaintiff drives the Cavalier to go to the grocery store and the pharmacy around Hartford City. (Valenti Dep., p. 33:7-21.)

In addition to being able to vote at the Montpelier vote center, Plaintiff is also entitled to vote by absentee ballot by mail or by early in-person voting at the circuit court clerk's office. (ECF 28, ¶ 39, ECF 51, ¶ 39.) The courthouse in Blackford County is located 500 yards away from Plaintiff's home. (Valenti Dep., p. 21:15-17.) Plaintiff has testified that there is no reason he cannot go to the courthouse other than his "inherent dislike for courts and law enforcement, in general." (Valenti Dep., p. 21:22-23.)

Absentee ballot by mail and early in-person voting at the courthouse are also insufficient for Plaintiff as, "voting absentee and voting at the courthouse really doesn't get the niche for the type of person [he] is." (Valenti Dep., p. 22:3-6.) Plaintiff argues that these methods are inferior to voting at the High School because he would be deprived of information in the late stages of an election campaign, he cannot engage with local candidates while voting early, and that voting by mail is prone to error and subject to risks that a voter's ballot may not be counted. (ECF 28, ¶¶ 41, 47; Valenti Dep. pp. 22:1-19, 36:3-14, 38:18-39:11.)

Plaintiff filed a class action complaint on behalf of himself and those similarly situated on August 18, 2015, alleging Indiana Code § 35-42-4-14 unjustifiably burdened his right to vote in person. (ECF 1.) Plaintiff filed a motion for preliminary injunction

alleging irreparable harm if he was unable to vote in person on Election Day, November 3, 2015.  (ECF 17.)  Defendants filed a response in opposition, pointing out that Plaintiff lives in a vote center county; therefore allowing him to vote in person at the Montpelier vote center.  (ECF 22.)  Plaintiff thereafter withdrew his request for a preliminary injunction.  (ECF 24.)

Defendants later filed a Motion to Dismiss on November 12, 2015, alleging Plaintiff had suffered no injury as he could vote in person at the Montpelier vote center and, thus, lacked standing to maintain his action.  (ECF 27.)  Plaintiff then filed his First Amended Class Action Complaint alleging Indiana Code Section 35-42-4-14 unjustifiably burdened his right to vote at the High School specifically.  (ECF 28.)  Defendants again filed a Motion to Dismiss the First Amended Complaint on December 21, 2015, arguing that Plaintiff had not been harmed by the Indiana statute as Plaintiff could vote at the Montpelier vote center, cast an absentee ballot by mail, or cast an in-person early absentee ballot at the courthouse.  (ECF 33.)  This Court denied Defendants' Motion to Dismiss on July 28, 2016, holding as follows:

> The Plaintiff alleges that Indiana Code § 35-42-4-14 prohibits him from voting in person on an election day at the polling place closest to him. While it remains to be seen whether this restriction rises to the level of a constitutional violation, the Plaintiff has met the low threshold for pleading injury required to demonstrate that he has standing.

(ECF 50, p. 4.)

Plaintiff later voted in the 2016 presidential election by voting absentee by mail from the Blackford County Jail in November 2016.  (Valenti Dep., pp. 22:20-23:4.)

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment if he can demonstrate to the court that there is no genuine issue of material fact and that the moving party is entitled to judgment in his favor as a matter of law. Fed. R. Civ. P. 56(a). "As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). The substantive law underlying the claim defines which facts are material, and the Court should only refrain from granting the motion when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

Importantly, if the nonmoving party fails to establish an essential element of his case, summary judgment is appropriate. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). Once a moving party indicates there is no issue of material fact, the non-moving party must counter this assertion by going "beyond the pleadings" and setting forth specific facts and evidence which demonstrate "the existence of a genuine, material, triable issue." *Green v. White,* 17 F.3d 199, 202 (7th Cir. 1994). A non-moving party's subsequent failure or inability to prove such elements

"renders all other facts immaterial" and is ultimately fatal to the claim.  *Id.* (*citing Celotex,* 477 U.S. at 323).

### III. ARGUMENT

Plaintiff's First Amended Class Action Complaint focuses on the narrow question of whether Indiana Code Section 35-42-4-14 imposes an unconstitutional burden on his right to vote.  He alleges that he has a right to vote at the polling location closest to his home and that the Indiana prohibition on sex offenders entering school property infringes upon that right.  It does not, and Plaintiff may exercise his vote in a number of ways available to registered voters in Indiana.

#### A.  Voting procedures available to Plaintiff under Indiana law.

As noted above, Plaintiff may vote at the vote center located at the Montpelier Civic Center a few miles away from his home.  Blackford County, where Plaintiff resides, is a vote center county.  There are no traditional precinct polling places in Blackford County because Blackford County elected to adopt vote centers.  Under Indiana law, a county that meets certain requirements may elect to employ vote centers instead of precinct polling places.  Ind. Code § 3-11-18.1-3.  Blackford County is one such county.  http://www.in.gov/sos/elections/3574.htm (last visited December 14, 2016).  Blackford County has had two designated vote centers since they adopted their vote center plan in 2012, through their latest amendments in 2015.  Blackford County Vote Center Plan, Exhibit A; *available at* http://www.in.gov/sos/elections/3574.htm (last visited December 14, 2016).  One vote center is at the Blackford County High School Auxiliary Gym, and the other is located at the Montpelier Civic Center.  Ex. A; *available at*

http://www.in.gov/sos/elections/3574.htm (last visited December 14, 2016). A vote center must use equipment and procedures to ensure that information a voter enters into an electronic poll book is immediately accessible to the county election board and the electronic poll book used at another vote center in the county. Ind. Code § 3-11-18.1-4(11). This means Plaintiff could vote at either location and his ballot would be identical at both.[1]

In addition, Plaintiff can vote by in-person absentee ballot. Open to all registered voters, including Plaintiff, in-person absentee voting allows a registered voter to cast a ballot at the court clerk's office. Ind. Code § 3-11-10-26(a)(1). A registered voter may cast his vote at the court clerk's office starting twenty-eight (28) days before Election Day up until noon the day before the election. Ind. Code § 3-11-10-26(e). The court clerk's office is located in the courthouse at 110 West Washington Street, Hartford City, IN 47348. http://www.gov.blackfordcounty.org/pages.asp?PageIndex=362 (last visited December 14, 2016). Plaintiff has testified that he estimates the distance from his own home to the courthouse to be about 500 yards. (Valenti Dep. p. 21:15-17); *see also* Counsel Generated Google Map, Exhibit B.[2]

Lastly, Plaintiff is able to vote by mail via absentee ballot. This option, available only to certain voters, including those expecting to be absent from their voting county on Election Day, the disabled, and the elderly, permits voters to mail in their ballots. Ind.

---

[1] Although different from the traditional method of in-person voting at a designated polling place, Indiana clerks will assist voters seeking guidance about their many options and clerks' telephone numbers are listed on the back of the absentee ballot.

[2] Undersigned counsel has created Exhibit B for the Court's convenience so it may take judicial notice of the distances between relevant locations in this case as approximated by the Google Maps tool.

Code § 3-11-10-24. Those defined as "serious sex offenders" may also vote by way of a mail-in absentee ballot. Ind. Code § 3-11-10-24(a)(12). Absentee ballots are a perfectly reliable option exercised by 33% of Indiana residents in the 2016 General Election. http://www.in.gov/sos/elections/files/2016_General_Election_Turnout.pdf (last visited December 21, 2016). Despite Plaintiff's assertions of mail-in voting being an inferior method of voting, millions of Americans recognize that absentee voting represents a "convenient method of exercising the franchise." *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 811 (1969). In the event any voters have issues or questions while filling out an absentee ballot, the county clerk is available to answer questions by telephone number, conveniently located on the back of the absentee ballot. http://www.in.gov/sos/elections/2402.htm (last visited December 14, 2016).

### B. Plaintiff's First and Fourteenth Amendment claims

Plaintiff contends that Indiana Code Section 35-42-4-14 unjustifiably burdens his right to vote in violation of the First and Fourteenth Amendments. "A state election law, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" *Common Cause Ind. v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 917 (7th Cir. 2015) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). However, not every voting law must be analyzed under strict scrutiny. *One Wisc. Institute v. Thomsen*, 2016 WL 4059222, *25 (7th Cir. July 29, 2016). "Requiring states to narrowly tailor their election regulations to advance only compelling interests 'would tie the hands of States

seeking to assure that elections are operated equitably and efficiently.'" *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). Courts in the Seventh Circuit therefore apply a "flexible standard" when reviewing challenges upon the right to vote. *Common Cause*, 800 F.3d at 917.

While Indiana Code Section 35-42-4-14 is not a law that was passed with the intent of regulating elections, Plaintiff has challenged the law originally meant to curb serious sex offenders' contact with children as a burden on his voting rights. As such, Plaintiff's challenge should be analyzed under the same tests used to adjudicate state voting regulations and their burden upon voting rights under the First and Fourteenth Amendments.

"[T]he rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. The Seventh Circuit uses a three step analysis to determine such questions: 1) the court must determine "the nature and severity of the burden" that a state law imposes on the right to vote; 2) the court looks to the state's interests in enacting the challenged law; and 3) the court must weigh the burdens imposed by law against the state's interests in enacting it "and then make the 'hard judgment' that our adversary system demands." *One Wisc.*, 2016 WL 4059222, at *25 (quoting *Crawford v. Marion Cty*, 553 U.S. 181, 190 (2008)).

The first step focuses upon the burdens that a challenged law places on otherwise eligible voters. *Id.* "A burden is deemed to be a severe burden if it "go[es] beyond the

mere inconvenient."  *Harlan v. Scholz*, 2016 WL 5477103, *3 (7th Cir. September 27, 2016)

(quoting *Crawford*, 553 U.S. at 205).

In the second step of the inquiry, a court should "consider the precise interests put

forward by the State as justifications for the burden imposed by its rule, taking into

consideration the extent to which those interests make it necessary to burden the

plaintiff's rights."  *One Wisc.*, 2016 WL 4059222 at *26 (quoting *Common Cause*, 800 F.3d at

921) (citations and internal quotes omitted).

Lastly, the court weighs the burdens of the law against the state's interests.  *Id.*

The severity of the burden of the law impacts the level of scrutiny given during this step.

*Id.*

> When the state imposes a severe restriction on the right to vote, then the
> regulation must be narrowly drawn to advance a state interest of
> compelling importance.  But when a state election law provision imposes
> only reasonable, nondiscriminatory restrictions upon the First and
> Fourteenth Amendment rights of voters, the State's important regulatory
> interests are generally sufficient to justify the restrictions.

*Id.* (internal citations and quotes omitted).

### 1.  The burden imposed upon the Plaintiff is minimal.

Plaintiff's claim boils down to his argument that his preclusion from voting at one

particular vote center at the High School on Election Day is an unconstitutional burden

on his right to vote.  Plaintiff attempts to characterize this as a significant burden, but no

authority supports such a claim.  Plaintiff may take advantage of all voting methods

Indiana law offers, including voting in person at the Montpelier Civic Center, providing

Plaintiff the same voting experience he asserts Indiana Code Section 35-42-4-14 deprives

him from enjoying on Election Day.  It is unclear whether Plaintiff is suggesting that there

is a right to have a polling place within a certain mileage of one's home.  If so, there is no

such right, but even if there was, Plaintiff has other options as discussed above, including

mail-in absentee voting and in-person absentee voting available 500 yards from his home.

Plaintiff may even vote on Election Day, in person, at the Montpelier Civic Center.

Plaintiff's argument that barring him from one specific vote center constitutes a

severe burden on his right to vote cannot stand.  As noted above, a severe burden must

go beyond a "mere inconvenience."  *Harlan v. Scholz*, 2016 WL 5477103, *3 (7th Cir.

September 27, 2016) (quoting *Crawford*, 553 U.S. at 205).  For an example of what *does not*

go beyond mere inconvenience, with respect to voter identification laws, the Supreme

Court held in *Crawford* that "the inconvenience of making a trip to the [department of

motor vehicles], gathering the required documents, and posing for a photograph surely

does not qualify as a substantial burden on the right to vote, or even represent a

significant increase over the usual burdens of voting."  *Crawford*, 553 U.S. at 198.

Plaintiff essentially must show that being unable to vote at the High School, and

instead being required to exercise his voting rights by voting at the Montpelier Civic

Center, in-person absentee ballot, or mail-in absentee ballot, is a larger burden than the

voter identification law upheld by both the Seventh Circuit and the United States

Supreme Court in *Crawford*.  This he cannot do.  In fact, the local office of the Indiana

Bureau of Motor Vehicles, to which Plaintiff likely went to five times in order to receive

his driver's license (Valenti Dep., p. 29:2-19), is conveniently located across the street from

the county clerk's office where Plaintiff can vote by in-person absentee ballot.  *See* Ex. B.

Plaintiff has testified that this is around 500 yards, walking distance, from his home down the street. *See* Ex. B. (actual distance estimated by Google Maps to be .299 miles or 526.24 yards). If forcing Plaintiff to walk to the local BMV, gather the documents required for the issuance of a government ID, and pose for a photograph is not a severe burden on his right to vote, barring him from one vote center and making him walk the same distance to the county clerk's office to vote in-person by absentee ballot most certainly does not go beyond mere inconvenience.

Further, even if the courthouse was not so conveniently located near Plaintiff's home, the availability of voting by mail-in absentee ballot is more than enough to alleviate the minimal burden imposed upon him.

There is no constitutional right to vote by absentee ballot, and, as recognized in the Southern District of Indiana, that means that there is no constitutional right to vote in person. *Indiana Democratic Party v. Rokita*, 458 F.Supp.2d 775, 813 (S.D. Ind. 2006) (citing *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004)). The court in *Rokita* stated, "Voting by absentee ballot instead of in person, does not, by itself, constitute an injury in fact since there is no established constitutional right to vote in person." *Id.* The court additionally noted that all ballots in the state of Oregon are cast absentee by mail. *Id.* at 813 n. 56. The ability of all the voters burdened by the voter ID law in *Rokita* to exercise their right to vote via mail-in absentee ballot was enough to lessen the hardship imposed upon them:

> There is no evidence that voting absentee would be a burden or hardship for any of these individuals; indeed, three of the Named Individuals disclosed they had voted absentee in past elections. As discussed above, several of the Named Individuals apparently do not wish to vote absentee;

however, this abrogation of their personal preferences is not a cognizable injury or hardship.

*Id.* at 823 n. 71. If Plaintiff was correct in his assertion that there is a constitutional right to vote in person in the polling place of their preference, "every single Oregon voter would have had their constitutional rights infringed." *Id.* at 813 n. 57.

The availability of mail-in absentee voting alone shows the burden imposed by Indiana Code Section 35-42-4-14 is not severe. As noted above, voting by absentee ballot is a constitutionally sufficient manner of exercising the right to vote. Plaintiff brings up many issues he has with absentee voting, but Plaintiff himself has voted absentee in the past. (Valenti Dep., pp. 22:20-23:4.) Plaintiff contends that he wants to discuss political issues with his peers (Valenti Dep., p. 22:1-19), but Indiana Code Section 35-42-4-14 contains no prohibition from him doing so. Plaintiff simply cannot do so on school property. In addition, while Plaintiff has said he wants to meet local candidates on Election Day, Plaintiff has testified that local candidates have visited him at his home. (Valenti Dep., pp. 41:8-15.) Voting by mail-in absentee ballot does not prohibit him from discussing political issues with his peers, nor meeting local candidates. To be certain, Plaintiff can take it upon himself to contact local campaigns, his neighbors, research online, or read the local paper to become informed about the political issues relevant in his community. To claim that voting by mail-in absentee ballot precludes Plaintiff from participating in these activities is false. In addition to voting by in-person absentee ballot at the Courthouse, Plaintiff's opportunity to vote by mail-in ballot shows that his

prohibition of entering the High School is a minimal burden, at best, upon his right to vote.

Lastly, Plaintiff has the ability to partake in the exact voting experience he desires (voting in person, on Election Day, with his peers) by driving to the Montpelier Civic Center. Plaintiff says he does not know where the Montpelier Civic Center is and that it is too far for him to travel (Valenti Dep., p. 23:11-20.) However, Plaintiff owns two cars, but claims he cannot drive either to the Montpelier Civic Center because he does not have legal title to his truck and his Chevy Cavalier "has a nice knock when you start out." (Valenti Dep., pp. 29:20-32:19.) Despite this knock, Plaintiff drives the car around town to the pharmacy and to the grocery store. (Valenti Dep., p. 33:7-18.)

While Defendants recognize the Montpelier Civic Center might be farther away than the High School, that distance does not rise to a severe burden upon Plaintiff's right to vote. Plaintiff has a car and while he is concerned about its road worthiness, he still drives it around town. Surely the recurring use of his vehicle has amounted to more time on the road than the distance to the Montpelier Civic Center. Plaintiff could additionally pursue legal title to the otherwise roadworthy truck that he has in his possession or Plaintiff could ask a friend to take him to the polls. The State cannot take into account every individual citizen's transportation woes in determining where every vote center or polling location is located. Unequal distances are simply inevitable.

Plaintiff may be farther away from an eligible vote center than others, but "unavoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection." *Griffin*, 385

F.3d at 1132.  It is impossible for a state to come up with a system that appeases every voter's personal preference regarding distance to a voting location, but such personal preferences are not cognizable hardships upon the right to vote.  *Rokita*, 458 F.Supp.2d at 823, n. 71.  Just because voting by mail, voting at the Courthouse, or voting at the Montpelier Civic Center do not "get the niche for the type of person [Plaintiff] is," does not mean that Plaintiff's right to vote has been severely burdened.  (Valenti Dep., p. 22:3-6.)  The burden upon Plaintiff's right to vote is minimal.

As the burden upon Plaintiff's right to vote is not severe, the State's interests are given more deference and do not require a narrow tailoring analysis.  *One Wisc.*, 2016 WL 4059222 at *26 (quoting *Anderson*, 460 U.S. at 788).

**2. The State's interest in enacting Indiana Code Section 35-42-4-14 was safeguarding children from sexual predators.**

Moving on to the State's interest in enacting Indiana Code Section 35-42-4-14:

"Sex offenders are a serious threat in this Nation."  *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion).  "[T]he victims of sex assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault."  *Id.*, at 32-33.  Connecticut, like every other State, has responded to these facts by enacting a statute designed to protect its communities from sex offenders and to help apprehend repeat sex offenders.

*Conn. Dept. of Public Safety v. Doe*, 538 U.S. 1, 4 (2003).  The risk of recidivism by sex offenders is "frighteningly high."  *Smith v. Doe*, 538 U.S. 24, 34 (2002) (quoting *McKune*,

536 U.S. at 32).  For these reasons, extraordinary steps have been taken to protect children from sexual predators.

"In 1994, a seven-year-old New Jersey girl, Megan Kanka, was raped and murdered after a convicted sex offender moved into the house across the street from Megan, and lured her into his house by promising Megan that she could see his new puppy." *State v. Williams*, 728 N.E.2d 342, 348 (Ohio, 2000) (citing Weston, MEGAN'S LAW FAMILIARITY COMPLICATES JURY SELECTION (Jan 13, 1997), N.N.J Record at A4). Subsequent to this heinous crime, a national outcry resulted and the state of New Jersey enacted its *Megan's Law* (N.J. Stat.Ann. 2C:7-1 *et seq.*).  The New Jersey law was quickly followed by national legislation enacted by the United States Congress, the *Jacob Wetterling Act. Smith v. Doe,* 538 U.S. at 89-90.  Under threat of loss of federal funding, the *Wetterling Act* mandates each state to adopt sex offender registration laws.  *Id.*  In 1996, the *Wetterling Act* was amended to require each state to enact laws requiring that a local community be notified when a registered sex offender moved into that community.  *Id.*  By 1996, all fifty states and the District of Columbia had enacted some form of Megan's Law.  *Id.*

Since the enactment of these laws, sex offenders subject to these laws have raised a plethora of legal challenges to the restrictions imposed upon them.  As discussed further below, their legal claims have come in many forms, but are rarely successful.

The requirements of the registration and extra restrictions are based on the conviction of a crime, with the length of the registration and restriction requirements varying depending upon the crime committed and the facts of the particular commission. Registration and restriction schemes are designed to protect the public.  *Smith v. Doe*, 538

U.S. at 93.  The requirements are based on facts that have already been determined in accordance with the Due Process Clause.  *Conn. Dept. of Public Safety*, 538 U.S. at 4.  Certain convictions carry limitations that continue after the sentence expires.  For example, in some states a convicted person cannot practice medicine, a limitation that has been upheld.  *Hawker v. New York*, 170 U.S. 189, 197 (1898).  A convicted felon cannot be an officer or an agent of a union, a limit that has been upheld.  *DeVeau v. Braistad*, 363 U.S. 144, 160 (1960).  In *United States v. Jester*, 139 F.3d 1168 (7th Cir. 1998), the Seventh Circuit affirmed judgment as to a conviction for possession of a firearm by a convicted felon as against a challenge that the crime was a status offense of the same nature as *Robinson v. California*, 370 U.S. 660 (1962).  The Seventh Circuit has upheld the mandatory requirement to provide DNA samples.  *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004).  State laws that completely disenfranchise felons from exercising their voting rights have additionally been upheld.  *Richardson v. Ramirez*, 418 U.S. 24, 54-56 (1974).  There are many privileges that are lost as a result of a conviction.

Therefore, convictions extinguish certain rights and the states have the right (some would say "the obligation") to protect society, especially those who are the most frequent target of sexual predators.  It needs to be kept in mind that these laws apply only to those who have been convicted of designated sex crimes and only while they are under a requirement of registering as a sex offender.  That fact, coupled with the facts observed in *Connecticut Department of Public Safety v. Doe* that sex offenders are a threat to juveniles and are the most likely to re-offend, shows that the state has the ability to prevent sex offenders from entering a school.

It has been held that it is logical to guard against further crimes through registration and restrictions of sex offenders. The placement of sex offender parole conditions on a person not convicted of a sex offense has been found reasonable to guard against possible violations. *Weiss v. Indiana Parole Board*, 838 N.E.2d 1048 (Ind. Ct. App. 2005), *trans. denied.* It is reasonable to ban a sex offender from city parks where children play. *Doe v. City of Lafayette*, 377 F.3d 757, 766 n.8 (7th Cir. 2004); *see also id.* at 767 ("They do not need to wait until a child is molested to take steps to protect their children."). It is equally reasonable to protect society by keeping convicted sex offenders out of our schools and Indiana Code Section 35-42-4-14(b) has been upheld against an *ex post facto* challenge in the Indiana Court of Appeals. *McVey v. State*, 56 N.E.3d 674, 681 (Ind. Ct. App. 2016). The General Assembly does not need to wait until a sex offender commits another sex crime before providing for monitoring or limiting where the offender can live in relation to a school, youth program center or public park. If Plaintiff has a claim that the statute is not wise, he needs to take that up with the General Assembly and not with this Court. There is a rational basis for the law, whether Plaintiff agrees or not, and that is all that is required as the burden upon his right to vote is minimal. *One Wisc.*, 2016 WL 4059222 at *26 (quoting *Anderson*, 460 U.S. at 788).

**3. The State's interest outweighs the minimal burden imposed upon the Plaintiff.**

During the third step of the *Anderson-Burdick* analysis, the court must weigh the State's interests against the Plaintiff's burden "and then make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190. Only when a State imposes

a severe burden upon the right to vote does a regulation require narrow tailoring. *Burdick*, 504 U.S. at 434. "But when a state election law provision imposes only 'reasonable nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). In addition, "the fewer the people harmed by a law, the less total harm there is to balance against whatever benefits the law might confer." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008).

It is clear that the State's interest in protecting youth from sex offenders far outweighs the minimal burden imposed upon the Plaintiff. As discussed above, the State's interests are paramount in protecting our children. Blackford County High School was in session during Election Day on November 8, 2016, and children would have likely been present if Plaintiff would have entered the school to cast his ballot at the High School. *See* Blackford County High School Calendar (*available at* http://www.bcs.k12.in.us/Calendar#/?i=1 (last visited December 20, 2016)). The State's prohibition on sex offenders entering schools is rationally related to the protection of children located within those schools.

Further, the burden upon the Plaintiff is minimal. Plaintiff cannot go to one vote center on Election Day, but can exercise his right to vote by voting early in-person absentee at the Courthouse 500 yards from his home, using a mail-in absentee ballot, or driving to the Montpelier Civic Center on Election Day to cast his vote alongside his peers in Blackford County. The General Assembly understood that some sex offenders might

be barred from entering a polling place and it is that exact reason that serious sex offenders are allowed to cast mail-in absentee ballots to alleviate this burden. *See* Ind. Code § 3-11-10-24(a)(12). It should be noted that restrictions imposed upon felons are routinely upheld and that felons "may be prohibited from possessing guns, voting, and holding certain professional positions." *Doe v. Prosecutor, Marion Cty., Ind.,* 566 F. Supp. 2d 862, 882 (S.D. Ind. 2008) (citations omitted). These restrictions are imposed to protect the general public and serve an important purpose.

Plaintiff cannot show that the burden upon his voting rights imposed by Indiana Code Section 35-42-4-14(b) outweighs the State's justification in barring sex offenders from school property. For the reasons above, and because there is no genuine issue of material fact, Defendants are entitled to judgment as a matter of law and request the Court dismiss Plaintiff's claims.

## CONCLUSION

For the foregoing reasons, Defendants request the Court enter summary judgment in their favor and dismiss all claims against them.

Respectfully submitted,

Gregory F. Zoeller
Attorney General of Indiana
Attorney No. 1958-98

By:   *s/Betsy M. Isenberg*
      Betsy M. Isenberg
      Deputy Attorney General
      Attorney No. 23856-71

By: *s/Drew Farrington*
Drew Farrington
Deputy Attorney General
Attorney No. 34006-49

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2016, the foregoing was electronically filed

with the Clerk of the Court using the CM/ECF system, which sent notification of such

filing to the following:

Kenneth J. Falk                        Jan. P. Mensz
ACLU OF INDIANA                        ACLU OF INDIANA
Email: kfalk@aclu-in.org               Email: jmensz@aclu-in.org


*s/Betsy M. Isenberg*
Betsy M. Isenberg
Deputy Attorney General


Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Phone:   (317) 232-6231
Fax:       (317) 232-7979
Email:    Betsy.Isenberg@atg.in.gov