UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRIAN VALENTI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-1304-WTL-MPB |
| | ) | |
| INDIANA SECRETARY OF STATE, in her | ) | |
| official capacity; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum in Support of Motion for Summary Judgment**

**Introduction**

Indiana Code § 35-42-4-14 ("unlawful entry statute") provides that certain sex offenders, defined by the statute as "serious sex offenders," are prohibited from entering school property. One of the consequences of this is that these persons will be prohibited from voting at a polling place located on school property. Brian Valenti is a resident of Blackford County who committed a qualifying sex offense in California more than a quarter of a century ago. He is registered to vote and would like to vote in future elections. Mr. Valenti, as do many voters, views voting on an election day as more than simply checking a box; he views it as a public celebration of his fundamental rights as a United States citizen, and as a unique opportunity to meet with local candidates, electioneers, and other concerned citizens from his community to discuss local issues that affect him and his family. The closest polling place, and the only one located in his town, however, is located on school property. Because Mr. Valenti is subject to Indiana Code § 35-42-4-14, he is unable to vote in person on an election day along with the rest of his community. Although Mr. Valenti may vote absentee, either by mail or in person prior to an election day, or, if he can find transportation, he can vote in another town located 12 miles

away, each alternative comes with its own unique set of burdens. There is no rational reason why Mr. Valenti should not be able to enter school property on an election day for the sole purpose of voting, and the statute fails even lower-level scrutiny under *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), and it certainly fails the required strict scrutiny. There are no contested issues of material fact and an injunction should be entered, allowing Mr. Valenti to vote in Hartford City on an election day, along with the rest of his community.

**Statement of undisputed material facts**

*The Unlawful Entry statute*

Effective July 1, 2015, a new section was added to the Indiana Code as Indiana Code § 35-42-4-14, which provides:

> (a) As used in this section, "serious sex offender" means a person required to register as a sex offender under IC 11-8-8 who is:
>
> > (1) found to be a sexually violent predator under IC 35-38-1-7.5; or
> >
> > (2) convicted of one (1) or more of the following offenses:
> >
> > > (A) Child molesting (IC 35-42-4-3).
> > >
> > > (B) Child exploitation (IC 35-42-4-4(b)).
> > >
> > > (C) Possession of child pornography (IC 35-42-4-4(c)).
> > >
> > > (D) Vicarious sexual gratification (IC 35-42-4-5(a) and IC 35-42-4-5(b)).
> > >
> > > (E) Performing sexual conduct in the presence of a minor (IC 35-42-4-5(c)).
> > >
> > > (F) Child solicitation (IC 35-42-4-6).
> > >
> > > (G) Child seduction (IC 35-42-4-7).
> > >
> > > (H) Sexual misconduct with a minor (IC 35-42-4-9).
> > >
> > > (I) A conspiracy or an attempt to commit an offense described in clauses (A) through (H).

(J) An offense in another jurisdiction that is substantially similar to an offense described in clauses (A) through (I).

(b) A serious sex offender who knowingly or intentionally enters school property commits unlawful entry by a serious sex offender, a Level 6 felony.

A level six felony, as defined by Indiana Code § 35-50-2-7, carries with it a fixed term between six months and two and one half years in prison and a fine of up to $10,000. *Id.* § 35-50-2-7(b). Those designated as "serious sex offenders" are also entitled to vote absentee by mail. Indiana Code § 3-11-10-24(a)(12) provides in part:

(a) Except as provided in subsection (b), a voter who satisfies any of the following is entitled to vote by mail:

\* \* \* \*

(12) The voter is a serious sex offender (as defined in IC 35-42-4-14(a)).

*Brian Valenti*

Brian Valenti is an adult resident of Blackford County, Indiana. Third Affidavit of Brian Valenti ¶ 1 (ECF No. 66-1) ("Third Valenti Aff."). Mr. Valenti moved to Blackford County in 2014 to be closer to his family. (*Id.* ¶ 2.) He currently owns a home in Hartford City, where he lives with his wife and daughter. (*Id.* ¶ 3.) Both Mr. Valenti and his wife are disabled, and do not work. (*Id.* ¶ 4.) Their sole source of income is $711 in Social Security Income. (*Id.* ¶ 5.)

In 1993, Mr. Valenti was convicted of the California offense of "Lewd or Lascivious Acts with Child Under 14 Years." (*Id.* ¶ 6; *see* Cal. Penal Code § 288.) He has not been convicted of any other sex offenses either before or after that time. (Third Valenti Aff. ¶ 7.) Because he has been required to register as a sex offender in Indiana, he is subject to Indiana Code § 35-42-4-14's prohibition on entering school property. (*Id.* ¶¶ 8, 15.)

Mr. Valenti is registered to vote, and he intends to vote in the next election. (*Id.* ¶¶ 9-10.) Blackford County has adopted a "vote center model" whereby Blackford County residents may vote on an election day at either of the two designated County vote centers located in Hartford City and Montpelier. *See* Indiana Election Division, *Vote Centers* (available at: http://www.in.gov/sos/elections/3574.htm) (last visited: Dec. 22, 2016); Blackford County, *Election and Voter Registration* (available at: http://gov.blackfordcounty.org/pages.asp? PageIndex=377) (last visited: Dec. 22, 2016). The Hartford City vote center is approximately three miles from Mr. Valenti's home while the Montpelier vote center is approximately 12 miles away. (Third Valenti Aff. ¶ 12.) Mr. Valenti, however, is prohibited by the unlawful entry statute from voting at the vote center in Hartford City, even though he would like to do so, because it is located in the Blackford County High School Auxiliary Gym ("High School"). (*Id.* ¶¶ 10, 15.)

Mr. Valenti would like to vote on an election day at the High School because he believes that voting in person with one's community has important associational and expressive qualities. (*Id.* at ¶¶ 11-14.) Mr. Valenti views voting on an election day as a celebration of his right to vote and is something that should be shared publicly with his community. (*Id.* ¶ 11.) He also views an election day as a unique and important opportunity to gain information about local politics. (*Id.* ¶¶ 11-13.) In the past, local candidates and electioneers have been present outside of the High School on an election day, greeting voters and handing out literature. (*Id.* ¶ 12.) Mr. Valenti would like to meet the candidates and electioneers, and talk with them about local issues that affect him and his family. (*Id.*) Mr. Valenti also values being able to talk to other voters from his community. (*Id.* ¶ 13.) For example, Mr. Valenti has a daughter in the local elementary school, and he has concerns about the curriculum and the school administration. (*Id.* ¶ 14.) He

would like to talk to other parents and candidates on an election day to get their perspectives on these issues. (*Id.*)

Barred from voting at the nearest polling place to his home, and the polling place where, due to proximity, a vast majority of his Town is likely to vote, Mr. Valenti has two alternatives: (1) vote at the only other vote center in the County, at the Montpelier Civic Center in Montpelier, Indiana, located approximately 12 miles from Hartford City; or (2) vote absentee by mail or at the circuit court clerk's office at least eight days before each election. (*See id.* ¶¶ 16, 18; Blackford County, *Election and Voter Registration* (available at: http://gov.blackfordcounty.org/pages.asp?PageIndex=377) (last visited: Dec. 22, 2016); Indiana Code § 3-11-10-24(a)(12).) Both alternatives come with significant burdens and inherent deficiencies that Mr. Valenti would not face if he were allowed to vote at his community polling place in Hartford City. (Third Valenti Aff. ¶ 16.)

Mr. Valenti cannot vote at the vote center located 12 miles away from his home in Montpelier because he does not have a vehicle that he can safely operate for that distance, and there are no buses or taxis in Hartford City that could take him to Montpelier. (*Id.* ¶¶ 18-24.) Mr. Valenti owns two vehicles, a 25-year-old Ford pickup truck and a 19-year-old Chevy sedan, but neither vehicle is operable. (*Id.* ¶ 20.) Despite repeated attempts, including filing a civil action, Mr. Valenti has not been able to obtain clear title to the Ford, and the Chevy, which Mr. Valenti purchased as a fixer-upper for $100, cannot be safely driven for more than a couple miles. (*Id.* ¶¶ 21-22.) Mr. Valenti does not have the money to have the Chevy fixed or to buy another car. (*Id.* ¶¶ 22-23.) The High School in Hartford City, on the other hand, is three miles from Mr. Valenti's home, and he can walk, ride his bike, or get a ride with someone who also votes at the High School. (*Id.* ¶ 25.)

Even if he were to find transportation to Montpelier, Mr. Valenti would still miss the opportunity to meet with local candidates and commune with his neighbors. (*Id.* ¶ 26.) Local Hartford City candidates have no reason to visit the vote center in Montpelier as their constituents are most likely to vote at the closest polling place, which is located in Hartford City. (*Id.* ¶ 27.) Candidates for Blackford County public office are also more likely to spend time at the polling place in Hartford City, which is the county seat for Blackford County. With a population of 6,220 Hartford City has nearly half of Blackford County's 12,766 residents. *See* U.S. Census Bureau, *American FactFinder* (available at: http://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml) (last visited: Dec. 22, 2016). By contrast, Montpelier has a population of 1,805. *Id.* Similarly, with a vote center in town, Hartford City residents have little reason to make the 12-mile trip to Montpelier to vote, and therefore Mr. Valenti is unlikely to meet people from his community there. (Third Valenti Aff. ¶ 27.) To Mr. Valenti, it feels like he is being banished from his community on an election day by being forced to vote in another town where he knows no one. (*Id.* ¶ 28.)

Voting absentee by mail is the alternative mode of voting provided by the challenged statute. *See* Indiana Code § 3-11-10-24(a)(12). For Mr. Valenti, however, it is also an inadequate substitute to voting at his community polling place on an election day. (*Id.* ¶ 29.) First, in addition to registering to vote, Mr. Valenti will need to complete the application for an absentee ballot and ensure that the Blackford County Election Board *receives* his ballot application at least eight days prior to the election, and *receives* his ballot by noon the day before an election day. (*Id.* ¶ 30; Blackford County, *Election and Voter Registration* (available at: http://gov.blackfordcounty.org/pages.asp?PageIndex=377) (last visited: Dec. 22, 2016); Ind. Code §§ 3-11-4-2(a), 3-11-4-3). Second, Mr. Valenti fears that even if he meets the requisite

deadlines for submitting an application for an absentee ballot and submitting an absentee ballot, the ballot will be rejected if he makes a mistake on the ballot or affidavit envelope. (*Id.* ¶ 33.) If he were to vote at his community polling place, an election judge could assist him with any questions he might have and furnish him with a new ballot if he made a mistake. (*Id.* ¶ 34.) Third, Mr. Valenti believes that there is a greater risk that his absentee ballot will not be counted due to inadvertent error on the part of election workers. (*Id.* ¶ 35.) Fourth, because Mr. Valenti's ballot must be *received* by noon on the day before an election day, he must mail in his ballot early, and will miss out on late-breaking political news prior to the election. (*Id.* ¶¶ 30-31.) He wants the ability to change his mind at the "last minute." (*Id.* ¶ 32.) Finally, Mr. Valenti would be deprived of the associational and expressive aspects that come with voting in person with one's community, including the ability to learn about local political issues from his neighbors and from the candidates and electioneers that congregate outside of local polling places (*Id.* ¶ 36.) Although his vote may be counted if he votes absentee, Mr. Valenti feels that this early and private form of voting makes him less connected with the democratic process and less able to express his political voice. (*Id.* ¶ 37.)

Voting absentee at the circuit court clerk's office poses some of the same deficiencies as voting absentee by mail. (*See* Ind. Code § 3-11-10-26; Third Valenti Aff. ¶ 38.) First, Mr. Valenti would have to vote no later than noon the day before an election day, thereby missing important last minute developments in the campaigns. (*See* Ind. Code § 3-11-10-26(e); Third Valenti Aff. ¶ 39.) Second, Mr. Valenti would still not have the opportunity to engage with local candidates and voters outside of his community polling place on an election day. (Third Valenti Aff. ¶ 40.) Finally, for Mr. Valenti, who views voting with his community on an election day as

a celebration of his fundamental democratic rights, voting alone at the county court clerk's office at least a day before the election is a second-rate mode of voting. (*Id.* ¶¶ 41-42.)

**Summary Judgment Standard**

Under Rule 56 the party moving for summary judgment is entitled to judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Rule requires that the moving party identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden is satisfied, the non-moving party bears the burden of demonstrating that there are, in fact, genuine issues of material fact. *Harney v. Speedway SuperAmerica, LLC.*, 526 F.3d 1099, 1104 (7th Cir. 2008). "If no genuine issues of material fact exist, the sole question is whether the moving party is entitled to judgment as a matter of law." *Logan v. Commercial Union Insurance Co.*, 96 F.3d 971, 978 (7th Cir. 1996).

**Argument**

There are no contested issues of material fact here. Because of Mr. Valenti's conviction and because he has to register as a sex offender he is prohibited from voting at the Blackford County High School. As a result, Mr. Valenti will be deprived of the important associational and expressive aspects of voting in person on an election day at one's community polling place. He will also face significant burdens in voting absentee or in Montpelier. The unlawful entry statute, as applied to Mr. Valenti, significantly burdens his right to vote and it cannot be justified by a legitimate governmental interest. Summary judgment should issue in favor of plaintiff, preventing the State from enforcing the unlawful entry statute against Mr. Valenti when he votes.

## I.    The fundamental right to vote is violated if it is burdened without sufficient justification

The U.S. Supreme Court has stated clearly that voting is a fundamental right that cannot be unduly burdened or abridged.  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  The fundamental nature of that right is well established:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).  *See also, e.g.*, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966); *Wesberry v. Sanders*, 376 U.S. 1 (1964).  This right is implicit in various constitutional provisions including the equal protection clause of the Fourteenth Amendment and the First Amendment.  *Hall v. Simcox*, 766 F.2d 1171, 1173 (7th Cir. 1985); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (finding that "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" are protected by the First Amendment); *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969) (holding that "because of the overriding importance of voting rights, classifications which might invade or restrain them must be closely scrutinized and carefully confined where those rights are asserted under the Equal Protection Clause") (internal quotations omitted).

Although the right to vote is fundamental, courts do not necessarily apply strict scrutiny every time the right is impinged upon.  Rather, the Supreme Court applies a "more flexible standard" when considering a challenge to state laws that burden the right to vote, weighing:

> "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interest put forward by the State as justification for the burden

> imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). On the one hand, when the law "severely burdens the First and Fourteenth Amendment rights of voters, the regulation 'must be narrowly drawn to advance a state interest of compelling importance.'" *Common Cause Indiana v. Individual Members of the Ind. Election Comm'n*, 800 F.3d 913, 917 (7th Cir. 2015) (quoting *Burdick*, 504 U.S. at 434). On the other, when the law "imposes only reasonable, nondiscriminatory restrictions upon the rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quoting *Burdick*, 504 U.S. at 434) (internal quotations omitted). But where there are legitimate interests on both sides, the Supreme Court has "avoided preset levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue. And whatever the claim, the Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and the State's reasons for imposing those precise burdens." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 210 (2008) (Scalia, J., concurring).

## II.    The unlawful entry statute imposes significant burdens by prohibiting Mr. Valenti from voting at his community polling place on an election day

Indiana Code § 35-42-4-14 burdens Mr. Valenti's right to vote by prohibiting him from voting in person on an election day at the only polling place in his city: the High School. Barred from the High School, Mr. Valenti is deprived the associational and expressive aspects that come with voting with one's community. *See Williams*, 393 U.S. at 30; *Veasey v. Perry*, 71 F. Supp. 3d 627, 676–77 (S.D. Tex. 2014), *vacated in part, rev'd in part on other grounds sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (citing "substantial testimony that people want to vote in person at the polls, not even in early voting, but on election day" and, for example, that

"[f]or some African-Americans, it is a strong tradition—a celebration—to overcoming obstacles to the right to vote. Reverend Johnson considers appearing at the polls part of his freedom of expression, freedom of association, and freedom of speech").

Mr. Valenti, as do many other voters, views voting in person on an election day as a celebration of his right to vote and as something that should be shared publicly with his community. (*See* Third Valenti Aff. ¶ 11.) Voters often express their act of voting publicly throughout an election day; whether it be the indelible image of an Afghan voter displaying a finger stained with identifying ink as a badge of pride (*see* http://www.bbc.com/news/world-asia-26908464) (last visited Dec. 22, 2016) or an American voter wearing an "I voted" sticker given to him at his polling place, the very act of in-person voting is very much an expressive and associational activity.

Mr. Valenti would also benefit from talking with local candidates and electioneers who congregate around polling places on an election day; communing with fellow voters who share his political views; and debating with those who oppose his views. For example, Mr. Valenti has a daughter in the local elementary school, and he has concerns about the curriculum and the school administration. (Third Valenti Aff. ¶ 14.) He would like to talk to other parents and candidates on an election day to get their perspectives on these issues. (*Id.*) To Mr. Valenti, voting on an election day with his community is not just about checking a box for a candidate, but an opportunity to gain information and participate with his community in the democratic process.

Prohibited from voting at his community polling place, Mr. Valenti is faced with two alternatives: (1) vote 12 miles away at the Montpelier Civic Center; or (2) vote absentee, either by mail or in person at his county court clerk's office. Neither alternative, however, provides

Mr. Valenti the expressive, associational, and informational aspects that come with voting at the High School, and each alternative comes with its own particular set of burdens, as detailed below.

### A. Montpelier Civic Center

Voting at the vote center in Montpelier Civic Center is simply not a viable option for Mr. Valenti because he does not have transportation to make the 24-mile round trip to and from the Montpelier Civic Center to vote. (Third Valenti Aff. ¶¶ 18-24.) Although he owns two cars, one cannot be registered in Indiana, despite Mr. Valenti's best efforts; and the second cannot be driven safely for more than a mile or two. (*Id.* ¶¶ 19-22.) Mr. Valenti, who is disabled and whose sole source of income is $711 a month in Social Security Income, simply cannot afford to fix the car he has or buy a new one. (*Id.* ¶¶ 5, 23.) There are also no commercial taxis or buses that go between Hartford City and Montpelier. (*Id.* ¶ 24.) The burden Mr. Valenti faces in traveling to Montpelier each time he wants to vote is severe, if not insurmountable. (*Id.* ¶ 18-24.)[1]

### B. Voting absentee

Voting absentee, whether by mail or in person, requires Mr. Valenti to cast his ballot prior to an election day, and in a largely private setting: his home or the county court clerk's office. Mr. Valenti also faces several procedural burdens that come with voting absentee by mail that he would not face if he voted in person. Not surprisingly, courts have also emphasized the value of voting in person and, in particular, the inadequacy of absentee voting as a substitute. In

---

[1] But even if Mr. Valenti were to find transportation to the Montpelier Civic Center, he is still being deprived the associational and informational aspects that come with voting in one's community. By being forced to travel to Montpelier, Mr. Valenti is effectively being banished to another town, where he knows no one, and where particularly in municipal elections like the one being held next year, he has no opportunity to commune with those that care about the local issues that affect him. (*Id.* ¶ 28.)

*Griffin v. Roupas*, the Seventh Circuit stressed:

> [A]bsentee voting is to voting in person as a take-home exam is to a proctored one. Absentee voters also are more prone to cast invalid ballots than voters who, being present at the polling place, may be able to get assistance from the election judges if they have a problem with the ballot. And because absentee voters vote before election day, often weeks before, they are deprived of any information pertinent to their vote that surfaces in the late stages of the election campaign.

*Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) (internal citations omitted). Echoing the same concerns with absentee voting, the court in *Common Cause/Georgia v. Billups* rejected defendants' argument that the state's photo identification requirement for in-person voting was not a severe burden on plaintiffs' voting rights in part because they could vote absentee without producing a photo ID. *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1364 (N.D. Ga. 2005). The court cited several reasons why "absentee voting simply is not a realistic alternative to voting in person" and therefore "does not relieve the burden on the right to vote": (1) in order for the vote to count, it must be *received* (not merely post marked) by the registrar in the voter's district before 7:00 pm on an election day; (2) the absentee voter must plan sufficiently enough ahead to request an absentee ballot and receive it in time; (3) the absentee voter must complete the ballot correctly; and (4) the voter must know in advance that voting absentee is even an option, something that was not publicized at all by the state. *Id.* at 1364-65.[2]

---

[2]    After the court granted a preliminary injunction, the Georgia legislature passed a new version of its photo ID voting law which was upheld by the court after a bench trial was held and the court concluded that the photo ID law did not in fact pose an undue burden on voters. *Common Cause/Georgia v. Billups*, 504 F. Supp. 2d 1333 (N.D. Ga. 2007), *order vacated on other grounds and reentered*, 554 F.3d 1340 (11th Cir. 2009). In the interim, the Supreme Court in *Crawford v. Marion County Election Board* similarly found that Indiana's photo identification requirement was not a severe burden on in-person voting. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (plurality opinion). Neither decision, however, contradicts the basic point made in *Common Cause/Georgia* that being forced to vote absentee creates a significant burden on in-person voting; the Court in *Crawford* simply found that the photo ID requirement at issue in that case was not a significant enough burden to outweigh the government's interest in preventing fraud. *Id.* at 198-200. Unlike *Crawford* and *Common Cause/Georgia*, the State here is completely prohibiting Mr. Valenti, who is otherwise able, from voting at his community polling place, which brings the distinctions between absentee by-mail and in-person voting to the forefront.

The regulations for voting absentee in Indiana suffer from the same inherent defects identified in *Griffin* and the procedural burdens recognized in *Common Cause/Georgia*, making it a constitutionally deficient substitute.

First, an absentee voter who wishes to vote by mail must submit an absentee ballot application. Ind. Code § 3-11-4-2(a). The application must be received by the county election board before midnight on the eighth day before an election day if the application is mailed. *Id.* § 3-11-4-3(a)(4). If the absentee ballot application is received prior to the deadline, the county election board will mail an absentee ballot to the address stated in the application. *Id.* § 3-11-4-18(a). The county election board may, however, send the ballot with a request for additional documentation if, for example, the absentee voter has not previously voted in Indiana. *See id.*; Ind. Code § 3-7-33-4.5(a)(2)(A).

The absentee voter may then send an absentee ballot to the county election board, but, just as in *Common Cause/Georgia*, it must be *received* "in time for the board to deliver the ballot to the precinct election board of the voter's precinct before the closing of the polls on election day." *Id.* § 3-11-10-3. In the 2016 general election in Blackford County, the election board had to receive absentee ballots by noon on November 7, 2016, the day before election day. Blackford County, *Election and Voter Registration* (available at: http://gov.blackfordcounty.org/pages.asp?PageIndex=377) (last visited: Dec. 22, 2016).

Because of the strict deadlines for absentee ballots, there is a strong incentive to cast an absentee ballot early. But, as the Seventh Circuit emphasized in *Griffin*, by voting early, absentee voters are "deprived of any information pertinent to their vote that surfaces in the late stages of the election campaign." *Griffin*, 385 F.3d at 1131. As demonstrated by the 2016 presidential election, where the FBI made an announcement clearing the Democratic nominee for

President of criminal charges just two days before the election, and where hackers were releasing internal emails from the Democratic nominee's campaign up to and including an election day, the risk of missing out on late-breaking political developments is real and significant. *See* N.Y. Times, *Emails Warrant No New Action Against Hillary Clinton, F.B.I. Director Says*, Nov. 6, 2016 (available at: http://www.nytimes.com/2016/11/07/us/politics/hilary-clinton-male-voters-donald-trump.html) (last visited on Dec. 22, 2016); N.Y. Times, *Julian Assange Releases More Emails and Defends Wikileaks' Mission*, Nov. 8, 2016 (available at: http://www.nytimes.com/ 2016/11/09/us/politics/julian-assange-wikileaks-emails.html) (last visited Dec. 22, 2016). By voting early, the voter also runs the risk that the ballot will change before an election day, for example, in the event that a candidate drops out of an election or if a political party fills a vacancy with a new candidate. *See* Ind. Code § 3-11-10-1.5; § 3-13-1-1, *et. seq.* In order to cast a new ballot, the absentee voter would have to submit a written request to the circuit court clerk and wait for the new ballot to arrive. *Id.* § 3-11-10-1.5. The voter's request, however, will only be accepted if "the original absentee ballot has not been delivered to the appropriate precinct" and "the absentee voter's name has not been marked on the poll list." *Id.* § 3-11-10-1.5(b). Far from being a mere inconvenience, voting early puts Mr. Valenti at an informational disadvantage as compared to voting on an election day. He also faces the real risk that by voting early he may vote for a candidate who is no longer in the running and that his vote will therefore be irrelevant.

Mailing in an absentee ballot close to the deadline, on the other hand, runs the risk that the ballot will be delayed by the mail carrier or lost altogether, with no time left for the voter to obtain a replacement ballot. The absentee voter is therefore faced with deciding whether to

submit an absentee ballot early or late, both of which run risks that the in-person voter does not face.[3]

The various temporal and procedural hurdles that a voter must go through to vote absentee places a burden on the right to vote that simply is not there with in-person voting.  And although voting at the county court clerk's office reduces the procedural burdens, it still requires that Mr. Valenti vote at least a day early, and separately from his community of neighbors and local candidates who are likely to congregate around the High School on an election day.  For many voters, including those serving in the military, those in college, and those who are disabled, voting absentee may provide a convenient alternative.  But for Mr. Valenti, who for expressive, associational, and informational reasons, wishes to vote with his community on an election day, voting absentee is a second-rate form of voting.  Neither voting absentee in person nor by mail relieve the significant burden imposed on Mr. Valenti's fundamental right to vote. (*Id.* ¶ 30.)

## III.    The burden on Mr. Valenti's right to vote cannot be justified by any legitimate governmental interest

The Supreme Court has made clear that "[h]owever slight [the] burden [on voting rights]

---

[3]        According to a 2014 U.S. Election Assistance Commission report, over a quarter of a million absentee ballots were rejected nationwide, and in Indiana at least 2.5% of domestic absentee ballots were rejected.  U.S. Election Commission, 2014 Election Administration and Voting Survey Comprehensive, 12, 214, 225 (available at:  https://www.eac.gov/assets/1/Page/2014_EAC_EAVS_Comprehensive_Report_508_Compliant.pdf) (last visited Dec. 22, 2016).  The number one reason that an absentee ballot was rejected was that it was not returned to election officials in time, but other reasons included voters not signing the ballot envelope; voters sending the envelope back, but forgetting to include the ballot; voters using the wrong envelope; and voter signatures on the envelope not matching the one on file.  *Id.* at 12.  These risks of error are all present when voting absentee in Indiana.  *See* Ind. Code § 3-11-10-17 (detailing grounds for rejecting absentee ballots).  Although the voter is the source of many of these errors, as the Seventh Circuit emphasized, absentee voters "are more prone to casting invalid ballots" in part because they are deprived of the election judges, who are present at their polling place to assist with any questions the voter might have in correctly marking the ballot.  *Griffin*, 385 F.3d at 1131; *see also Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1364-65 (N.D. Ga. 2005) (detailing the regulatory requirements for absentee voting and concluding "absentee voting simply is not a realistic alternative to voting in person" and therefore "does not relieve the burden on the right to vote").

may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (plurality opinion) (internal citation and quotation omitted). In this way, the Court employs a "sliding scale" approach that weighs the severity of the burden on voting rights with the import of the state's justifications. *See Crawford*, 553 U.S. at 210 (J. Scalia concurring) (stating that the "sliding-scale balancing analysis" requires an appraisal of "both of the practical burdens on the right to vote and the State's reasons for imposing those precise burdens"). If the burden is severe, however, the statute must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434.

As detailed above, the burdens on Mr. Valenti's fundamental right to vote are substantial and must therefore be justified by an equally weighty state interest. But even if the Court were to apply a deferential standard under *Burdick*, the statute fails because it is not rational and not justified. The purpose of the unlawful entry statute appears to be an effort to protect children from "serious sex offenders." While this is certainly a substantial interest, it is the State's duty to demonstrate that there is a State interest to protect children from "serious sex offenders" *who vote in school-based polling places*. As applied to Mr. Valenti, the statute is fundamentally irrational because it is unreasonable to believe that a person previously convicted of a sex offense who is voting will use that as an opportunity to endanger children. *Cf. Valenti v. Hartford City, Indiana*, No. 1:15-CV-63-TLS, 2016 WL 7013871, at *8 (N.D. Ind. Dec. 1, 2016) (in case where Mr. Valenti challenged on state *ex post facto* grounds a local ordinance prohibiting him from entering child safety zones, finding "no reasonable person would think" allowing Mr. Valenti entry into his daughter's school to meet with teachers would "create a threat to children or to public safety.").

A polling place is a restricted area where only certain individuals are allowed to enter. *See* Indiana Code § 3-11-8-15(a).[4]  School children are not allowed in polling places unless they are accompanying adult voters, which is true regardless of where a polling place is located.  *Id.* § 3-11-8-15(a)(8).  In terms of incidental proximity to children, a polling place is therefore safer for children than a grocery store or a mall, where children are frequently unaccompanied by adults.  The risk to children at a polling place is de minimis and although the state has a general interest in protecting children, that interest is not reasonably promoted here.

Courts recognize that it is simply not enough for the state to argue that restrictions on sex offenders are necessary to protect children, without showing that the restrictions actually do that. *See, e.g.*, *Does #1-5 v. Snyder*, 834 F.3d 696, 705 (6th Cir. 2016), *reh'g denied* (Sept. 15, 2016) (in striking down Michigan law that restricted sex offenders from living, working, or loitering within 1,000 feet of a school, finding "at best[] scant evidence that such restrictions serve the

---

[4] Indiana Code § 3-11-8-15(a) reads:

> Only the following persons are permitted in the polls during an election:
> (1) Members of a precinct election board.
> (2) Poll clerks and assistant poll clerks.
> (3) Election sheriffs.
> (4) Deputy election commissioners.
> (5) Pollbook holders and challengers.
> (6) Watchers.
> (7) Voters for the purposes of voting.
> (8) Minor children accompanying voters as provided under IC 3-11-11-8.
> (9) An assistant to a precinct election officer appointed under IC 3-6-6-39.
> (10) An individual authorized to assist a voter in accordance with IC 3-11-9.
> (11) A member of a county election board, acting on behalf of the board.
> (12) A mechanic authorized to act on behalf of a county election board to repair a voting system (if the mechanic bears credentials signed by each member of the board).
> (13) Either of the following who have been issued credentials signed by the members of the county election board:
> > (A) The county chairman of a political party.
> > (B) The county vice chairman of a political party.
> . . . .
> (14) The secretary of state, as chief election officer of the state, unless the individual serving as secretary of state is a candidate for nomination or election to an office at the election.

professed purpose of keeping Michigan communities safe"); *McGuire v. Strange*, 83 F. Supp.3d 1231, 1268-69 (M.D. Ala. 2015), *appeal filed* (finding that requiring sex offenders to register with two agencies weekly and to complete two identical travel permit applications prior to traveling outside of their residential county were instances of "highly diminished returns coupled with substantially increased burdens" and were therefore not "reasonable in light of the [state's] nonpunitive objective"); *In re Taylor*, 343 P.3d 867, 869 (Cal. 2015) (finding that state law prohibiting paroled sex offenders from residing within 2,000 feet of a school or park failed rational basis review where it hindered efforts to monitor sex offenders by rendering many of them homeless and therefore bore "no rational relationship to advancing the state's legitimate goal of protecting children from sexual predators"); *State v. Small*, 833 N.E.2d 774, 782 (Oh. Ct. App.), *dismissed*, 832 N.E.2d 731, 782-83 (Ohio 2005) (finding "no rational basis" to subject a defendant who plead guilty to kidnapping a child to sex offender registration); *Raines v. State*, 805 So.2d 999, 1003 (Fla. Ct. App. 2001) (finding no rational basis for subjecting a defendant convicted of false imprisonment to a sex offender registry).  Here, it is similarly unreasonable to exclude persons previously convicted of sex offenses from polling places just because they happen to be in a school.

Even assuming the statute advances an interest in child safety, prohibiting Mr. Valenti from voting at his polling place on school property is "excessively burdensome" in light of any potential effect on child safety, *see Crawford*, 553 U.S. at 202 (plurality opinion) (quoting *Storer v. Brown*, 415 U.S. 724 (1974)), and it certainly is not "necessary to burden" Mr. Valenti's voting rights to protect children, *see Common Cause Ind.*, 800 F.3d at 921.  *See also Tripp v. Smart*, No. 14-CV-0890-MJR-PMF, 2016 WL 4379876, at *8 (S.D. Ill. Aug. 17, 2016), *appeal filed* (citing *Hall v. Simox*, 766 F.2d 1171, 117 (7th Cir. 1985) ("[I]f there is a lesser restriction

that protects most of the state's interest than the state's decision to impose a far greater restriction could suggest a lack of reasonableness on the state's part."). The statute is particularly excessive in light of laws Indiana has on the books that address the State's interest in child safety. *See* Indiana Code § 35-42-4-6 (prohibiting child solicitation); Indiana Code § 35-42-4-13 (prohibiting communication with minors concerning sexual activity). The burdens imposed on Mr. Valenti's right to vote far outweigh any potential benefit to child safety, and the unlawful entry statute, therefore, cannot be justified under *Burdick*.

## IV. The State's interests are not narrowly tailored, and therefore fail the heightened scrutiny mandated by *Burdick*

If the statute is not rational and does not meet the sliding-scale approach to scrutiny under *Burdick*, it certainly does not pass the strict scrutiny applied to severe burdens, where the statute must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. Narrow tailoring requires that the statute "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-10 (1984)). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). Furthermore, "the restriction cannot be overinclusive by unnecessarily circumscribing protected expression, or underinclusive by leaving appreciable damage to the government's interest unprohibited." *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (internal quotations and citations omitted). The statute here is both over-inclusive and under-inclusive.

In a decision that is directly on point, *Does I-IV v. City of Indianapolis*, this Court weighed the state's interest in protecting children from sex offenders against a sex offender's right to vote in person, using *Burdick*'s strict-scrutiny standard. *Does I-IV v. City of*

*Indianapolis*, No. 1:06-cv-865-RLY-WTL, 2006 WL 2927598 (S.D. Ind. Oct. 5, 2006). At issue in *Does I-IV* was an ordinance prohibiting certain sex offenders from being within 1,000 feet of public playgrounds and other recreation areas when children are present unless accompanied by a non-sex offending adult. *Id.* at *1. Because one of the plaintiffs lived in a precinct where his polling place was located in a public school with recreation areas, the ordinance effectively barred him from voting in person. *Id.* at *9-10. Although in theory he could still vote in person if he was accompanied by a qualified adult and if children were not present at the polling place, the court still found that the ordinance severely restricted the plaintiff's right to vote, despite his ability to vote absentee, and that the statute was not narrowly tailored. *Id.* at *10 ("Preventing persons from voting in-person is not narrowly tailored to advance the City of Indianapolis' interest in protecting persons, particularly children in the areas identified by the Ordinance.").

Similarly, in *Doe v. Prosecutor, Marion County, Indiana*, the plaintiffs challenged an Indiana law prohibiting certain sex offenders from using social networking web sites and other on-line methods of communication. 705 F.3d 694, 695 (7th Cir. 2013). The court found the law unconstitutional despite the state's legitimate interest in shielding children from "improper sexual communication." *Id.* at 698. The court found that the law "captures considerable conduct that has nothing to do with minors," and that "Indiana has other methods to combat unwanted and inappropriate communication between minors and sex offenders." *Id.* at 699. The court cited specific criminal statutes that prohibited communication with a child concerning sexual activity, as existing statutes that better advance Indiana's interest in preventing harmful interaction with children "(by going beyond social networks)" and "accomplish that end more narrowly (by refusing to burden benign Internet activity)." *Id.*[5]

---

[5]     In *Doe v. Harris*, the Ninth Circuit similarly struck down internet restrictions imposed on sex offenders that, for example, required the person to report to law enforcement authorities a new internet

The statute in this case is aimed at essentially the same evil in *Doe*, namely preventing illicit contact by a person convicted of a sex offense with a child, and it is similarly poorly tailored to that end because it is both over- and under-inclusive. The statute is over-inclusive because it "captures considerable conduct that has nothing to do with minors," specifically, it prohibits Mr. Valenti from exercising his constitutional right to vote in person at his community polling place. *Id.* (internal quotations omitted). The statute is under-inclusive because it leaves unaddressed polling places not located on school property, such as libraries and community centers, where plaintiffs would have just as much, if not more incidental contact with children. *See, e.g.*, Marion County Elections Board, *2016 Presidential Election Polling Location List* (available at: http://www.indy.gov/eGov/county/clerk/election/pages/home.aspx) (last visited: Dec. 22, 2016) (listing 43 precincts with polling places located either in a library or community center). In fact, any children that might be in a polling place are under greater supervision than in other public places because they are only permitted to be there if they are accompanying an adult. *See* Ind. Code § 3-11-8-15(a)(8). As in *Doe*, Indiana's law on child solicitation (Indiana Code § 35-42-4-6) and communication with minors concerning sexual activity (Indiana Code § 35-42-4-13) serve to demonstrate the statute's lack of tailoring by showing that there are better and more targeted laws already on the books to address the State's interest in child safety. Because Indiana Code § 35-42-4-14 is not "narrowly drawn to advance a state interest of compelling importance," the statute is unconstitutional. *Burdick*, 504 U.S. at 434.

---

identifier (*e.g.*, a username or handle used in internet communication) within 24-hours. *Doe v. Harris*, 772 F.3d 563, 568, 582 (9th Cir. 2014). Applying intermediate scrutiny, the court found that the 24-hour requirement was "not only onerous" but that it was not sufficiently tailored where the restriction was "applied in an across-the-board fashion . . . to all registered sex offenders, regardless of their offense, their history of recidivism (or lack thereof), or any other relevant circumstance." *Id.* at 582. Here, there is similarly no attempt to apply the prohibition on in-person voting in schools to those with relevant offenses or that pose a risk of recidivism by being on school property on an election day.

**Conclusion**

Indiana Code § 35-42-4-14 imposes a significant burden on Mr. Valenti's fundamental right to vote that cannot be justified by any legitimate state interest. It fails even the most deferential scrutiny under *Burdick* and certainly fails the heightened scrutiny that is reserved for the restrictions at issue here. There are no contested issues of material of fact and an injunction must issue so that Mr. Valenti can vote in person on an election day together with the members of his community.

s/ *Jan P. Mensz*
Jan P. Mensz
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
jmensz@aclu-in.org
kfalk @aclu-in.org
grose@aclu-in.org

## CERTIFICATE OF SERVICE

I hereby verify that on this 23rd day of December, 2016, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system:

Betsy Isenberg
Deputy Attorney General
Betsy.Isenberg@atg.in.gov

Christopher Farrington
Deputy Attorney General
Christopher.farrington@atg.in.gov

/s/ *Jan P. Mensz*
Jan P. Mensz
Attorney at Law