UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRIAN VALENTI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-1304-WTL-MPB |
| | ) | |
| INDIANA SECRETARY OF STATE, in her official capacity, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Response Memorandum in Opposition to Defendants' Motion for Summary Judgment and Reply Memorandum in Support of His Motion for Summary Judgment**

**Introduction**

The defendants ("the State") have enacted a law, Indiana Code § 35-42-4-14 (the "unlawful entry statute"), that prevents Brian Valenti from voting at his community polling place on an election day. Indiana law provides Mr. Valenti with alternatives for casting his vote, all of which come with their own specific burdens and deficiencies, but they do not change the fundamental fact that he will be unable to celebrate his right to vote on election day with his community members, and will be deprived of a unique opportunity to speak with local candidates and voters about their political beliefs. The State argues that these significant burdens on Mr. Valenti's right to vote are necessary to advance a general notion of child safety by enforcing a blanket ban on certain sex offenders from entering school property. But there is no rational reason why school children, who are not permitted to be unaccompanied in the voting area, and who are already in a highly-supervised environment, will be at risk on an election day. The blanket ban certainly does not meet narrow tailoring and survive heightened scrutiny, where it provides no exceptions for entering school property for legitimate purposes like voting, and

1

where there are already Indiana laws that address the dangers the State claims children face at school. There are no contested issues of material fact and an injunction should be entered, allowing Mr. Valenti to vote in Hartford City on an election day, along with the rest of his community.

**There are no disputed issues of material fact**

The State argues that there is a dispute of fact as to whether Mr. Valenti's "Chevy Cavalier is inoperable and cannot be driven a distance of 12 miles," the distance from his home to the Montpelier Civic Center. (Defs.' Response Br. 2 (ECF No. 73).) The State does not argue that this is material, and Mr. Valenti agrees. What is undisputed is that Mr. Valenti purchased the Cavalier for $100 (Valenti Dep. 31-32 (ECF No. 64-3)), he believes there are mechanical problems that make it unsafe to drive more than a couple miles (*id.* at 40), and he, in fact, does not drive it more than a couple miles at a time (*id.* at 23-24, 30, 33). The State offers nothing to refute those facts.[1]

**Argument**

As stated in previous briefing, the Supreme Court has articulated a "flexible standard" when considering a challenge to state laws that burden the right to vote, weighing:

> "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interest put forward by the State as justification for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

---

[1] The only evidence the State cites is Mr. Valenti's testimony from his deposition that he uses the car to pick up groceries and medicine from the pharmacy. (*See* Defs.' Response Br. at 2 (citing Valenti Dep. 31-32).) But it is important to examine exactly what Mr. Valenti said at his deposition. When asked whether he drives the Cavalier, he stated, "Only for the purposes of going grocery shopping and to the pharmacy to get our medications . . . . Maybe a mile." (*Id.* at 33.) "Other than that, no, I don't drive." (Id.) When asked if he would drive the Cavalier further than that, Mr. Valenti responded, "Chances are I wouldn't. And if it was an emergency, I would say—and drive. Voting is not an emergency." (*Id.* at 33-34.).

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "However slight [the] burden [on voting rights] may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality opinion) (internal citation and quotation omitted). *See also Crawford*, 553 U.S. at 210 (J. Scalia concurring in judgment) (stating that the "sliding-scale balancing analysis" requires an appraisal of "both of the practical burdens on the right to vote and the State's reasons for imposing those precise burdens"). With those principles in mind, the district court in *One Wisconsin Inst., Inc. v. Thomsen*, articulated a three-step inquiry for assessing the constitutionality of a voting restriction under *Burdick*:

> First, the court must determine the nature and severity of the burden that a given provision imposes. Second, the court must identify the state's justification for the provision. Third, the court must weigh the burdens against the state's justifications for imposing them "and then make the 'hard judgment' that our adversary system demands."

No. 15-CV-324-JDP, 2016 WL 4059222, at *25 (W.D. Wis. July 29, 2016), *appeal filed* No. 16-3083 (7th Cir.) (quoting *Crawford*, 553 U.S. at 190). Each step is reviewed in turn below.

**I.    The unlawful entry statute imposes significant burdens on Mr. Valenti's ability to vote by completely barring him from voting with his community on election day at the Blackford County High School**

The sliding-scale balancing analysis dictated by *Burdick*, requires this Court to determine the "character and magnitude" of the burden posed by the regulation at issue. *Burdick*, 504 U.S. at 434. As an initial matter, the State does not dispute that Mr. Valenti is completely barred by the challenged law from voting at the Blackford County High School, the place where he, and the vast majority of the voters in Hartford City, would go to vote. The common refrain throughout the State's response, however, is that Mr. Valenti does not have a "constitutional right" to vote in any particular way at any particular place, and therefore he is not burdened at

3

all. (*See* Defs.' Response Br. 5 ["None of Plaintiff's cases recognize a constitutional right to socialize with others on Election Day, a right to speak with candidates on Election Day, a right to vote at a polling location of one's own choice or location closest to one's home . . . ."], 6 ["No portion of the *Veasey* opinions noted a constitutional right to be at a specific polling location or vote center to discuss issues with fellow voters."], 7 ["Plaintiff cites no authority for the notion that there is a constitutional right to speak with a candidate on Election Day"], 11 ["There is no constitutional right to vote in person."].)

The court in *One Wisconsin* rejected a similar argument from the state. 2016 WL 4059222, at *27. In *One Wisconsin*, the plaintiffs challenged new state restrictions on in-person absentee voting, including limiting locations and hours that made it more difficult for some voters, who were eligible to vote absentee, to vote. *Id.* The state countered that plaintiffs' case never got off the ground because "there is no constitutionally protected right to cast an absentee ballot," citing the Seventh Circuit's statement in *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004), that the Constitution does not "require all states to allow unlimited absentee voting." 2016 WL 4059222, at *28 (quoting *Griffin*, 385 F.3d at 1129). The court rejected the state's argument, holding:

> [T]his case is not about Wisconsin's outright refusal to allow in-person absentee voting. Rather, plaintiffs allege that the state is denying them the opportunity to exercise a right that they already have. Put differently, plaintiffs contend that by choosing to give its citizens the privilege of in-person absentee voting, the state must administer that privilege evenhandedly. *See Zessar v. Helander*, No. 05–cv–1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006) ("[O]nce [states] create such a regime, they must administer it in accordance with the Constitution." (*citing Paul v. Davis*, 424 U.S. 693, 710–12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976))). The court therefore rejects defendants' argument that plaintiffs' challenge to the in-person absentee voting provisions does not implicate their constitutional rights.

*Id. See also Zessar*, 2006 WL 642646, at *6 (finding that although there is no constitutional right to vote absentee, "in creating an absentee voting program" the state "alter[ed] the rights of those electors who participate in the program"). Here, the State has established a polling place at a High School, within close proximity to Mr. Valenti's home, where, if not for the unlawful entry statute, he could vote with his community on election day, and enjoy all the associational and expressive benefits that come with it. The fact that there is no absolute right to vote in this manner is immaterial. By establishing a polling place at the High School where Mr. Valenti is otherwise entitled to vote, the State cannot simply burden that right without sufficient justification.

The burden here is significant. First, voting at the High School provides Mr. Valenti with the opportunity to commune with his fellow voters and to publicly celebrate his constitutional right to vote. (Pl.'s Summ. J. Br. 10-11 (ECF No. 67).) That voting carries with it expressive and associational characteristics beyond simply having one's vote counted cannot be seriously contested. *See, e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (finding that "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" are protected by the First Amendment);[2] *Veasey v. Perry*, 71 F. Supp. 3d 627, 676–77 (S.D. Tex. 2014), *vacated in part,*

---

[2]     The State implies that the associational rights articulated in *Rhodes* are only relevant in the context of regulations aimed at the formation of political parties. (Defs.' Response Br. 6.) But the State reads *Rhodes* too narrowly. As the Supreme Court explained in *Anderson*, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or *the voting process itself*, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson*, 460 U.S. at 787 (emphasis added). This is due in part to the fact that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Id.* at 786. The inverse of this is certainly true—laws that affect how voters vote will affect the associational rights of the candidates. That is well illustrated here where the unlawful entry statute prohibits Mr. Valenti from voting at his local polling place on election day, where he will have the opportunity to meet and speak with other local voters and candidates to inform his political beliefs. His associational rights are clearly implicated.

*rev'd in part on other grounds sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (citing "substantial testimony that people want to vote in person at the polls, not even in early voting, but on election day" and, for example, that "[f]or some African-Americans, it is a strong tradition—a celebration—to overcoming obstacles to the right to vote. Reverend Johnson considers appearing at the polls part of his freedom of expression, freedom of association, and freedom of speech").[3] In his testimony, Mr. Valenti has detailed the importance of voting in this manner, and the State has not disputed the sincerity of his beliefs.

The State does, however, attempt to minimize this aspect of the voting process as something unique to Mr. Valenti.[4] Of course, not every voter will choose to exercise their First Amendment rights on election day in the exactly the same way, and as the State points out, 33% of Indiana voters in the 2016 General Election chose to vote absentee, either in person or by mail, prior to Election Day. (*See* Defs.' Response Br. 10 (citing http://www.in.gov/sos/elections/files/2016_General_Election_Turnout.pdf).) But that means 67% of Indiana voters did choose to

---

[3] *Veasey* was a challenge to a Texas voter ID law, that the Fifth Circuit, ruling *en banc*, ultimately found violated Section 2 of the Voting Rights Act. *Veasey v. Abbott*, 830 F.3d 216, 265 (5th Cir. 2016). Because the court ruled on statutory grounds, it found it "unnecessary for the en banc court to address" the plaintiffs' constitutional claims." *Id.* Contrary to the State's claim that this portion of the district court decision is "no longer good law" (Defs.' Response Br. 6), like any district court decision, it is worth whatever persuasive value this Court chooses to give it. At the very least, this Court may take judicial notice of the fact that other voters value the same expressive attributes that Mr. Valenti finds important.

[4] The State makes much of Mr. Valenti's statement during his deposition that "voting absentee and voting at the courthouse doesn't get the niche for the type of person I am." (Valenti Dep. 22.) But Mr. Valenti elaborated in his deposition and affidavit why he views voting in person with his community on an election day as important. (Valenti Dep. 22, 35-36, 41; Valenti Aff. 11-14.) In the same exchange, Mr. Valenti explained that he would like to "be in a crowd and confer with other people," and "I would have liked to know if the current superintendent was better suited than the superintendent for the schools here." (Valenti Dep. 22.) Later he stated, "[I]f the polling location is going to be at a school, I should be able to go to a school so I could stand there and talk to my neighbors and find out their views, since they've lived here their whole life, and be able to get a sense of what other Christians in my community where I live have an idea of what they feel is better going on in our community." (Valenti Dep. 36.) The value of being able to commune with one's neighbors and speak to local candidates on an election day are important aspects to voting that are not unique to Mr. Valenti.

vote on Election Day, despite the inconvenience that often comes with voting in the middle week when most people need to work, and when there is more likely to be long lines at polling places, traffic, insufficient parking, and other disruptions. This is not surprising, given what the Seventh Circuit in *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004), acknowledged were numerous advantages to voting in person on election day, including the ability "to get assistance from the election judges if [voters] have a problem with the ballot" and to avoid missing out on "any information pertinent to their vote that surfaces in the late stages of the election campaign." And as the plaintiffs in *Veasey* expressed, and what is commonly reported in the news on any given election day, many voters do view voting on an election day as a public expression of their constitutional rights that is celebrated with their community. (*See Veasey*, 71 F. Supp. 3d at 676–77; Pl.'s Summ. J. Br. 11 (citing news articles).)

Second, voting at the High School also presents the opportunity for Mr. Valenti to get important information from local candidates, electioneers, and other local voters outside of polling places on an election day, another benefit of voting at the High School that he would be deprived of under the challenged statute. (Pl.'s Summ. J. Br. 11.) The State argues that because Mr. Valenti could, in theory, engage in these activities elsewhere and prior to an election day, the burden is minimal. (Defs.' Response Br. 7.) Whether Mr. Valenti will get the same opportunities to engage in conversations with the same candidates, electioneers, and other local voters in other places before an election day is highly speculative; it does not change the fact that the unlawful entry statute forecloses an obvious and unique opportunity for these interactions that are, again, afforded to Mr. Valenti by virtue of the election regime that is in place in Hartford City. This is a substantial burden and it must be justified by equally weighty state concerns under *Burdick*.

The State continues to argue that these burdens are lessened by the availability of other methods of voting, including voting at the the Civic Center in neighboring Montpelier, or by voting absentee, either by mail or in person, prior to election day. They do not lessen the burden and in fact impose several unique burdens of their own.

### a. Montpelier Civic Center

The State continues to offer the Montpelier Civic Center, located 12 miles away from Mr. Valenti's home, as a viable alternative that alleviates the burdens posed by the unlawful entry statute. As detailed above and in his previous brief, Mr. Valenti simply does not have reliable transportation, and the State has offered no evidence to refute that fact.[5] But even if Mr. Valenti did manage to get to Montpelier, he is still being deprived the ability to celebrate his voting rights with his community, talk to other voters about local issues, and meet with Hartford City candidates who are unlikely to go to Montpelier. As Mr. Valenti stated in his affidavit, "[p]sychologically, it feels like I am being banished from my community on election day by being forced to vote in another town where I know no one." (Third Valenti Aff. ¶ 28.)

The State, nonetheless argues, citing *Griffin*, 385 F.3d at 1132, that "unavoidable inequalities in treatment" will result from any voting regime, including unequal distances to polling places. (Defs.' Response Br. 8.) But unlike the plaintiffs in *Griffin*, who demanded access to absentee mail-in voting that was open only to limited categories of people, Mr. Valenti is not asking the State to open a new polling place that is more convenient for him. He is simply asking to access the High School vote center that is already open to all voters in his community

---

[5] The State claims Mr. Valenti could get a ride from a friend or another voter from Hartford City who is voting in Montpelier. (Defs.' Response Br. 8.) This would hardly be a minimal burden since Mr. Valenti would need to find a friend willing and able to drive him each and every time he wanted to vote. Furthermore, there is no reason why a voter in Hartford City would drive 12 miles to vote in Montpelier, and Mr. Valenti has no way of finding such a voter if one existed. With no public transportation or taxis for hire, getting to Montpelier remains a significant burden on Mr. Valenti's ability to vote there.

on an election day, so that he can vote with them. *See Zessar*, 2006 WL 642646, at \*6; *One Wisconsin*, 2016 WL 4059222 at \*28. Barring him completely creates a significant burden on his right to vote that must be justified with an equally weighty state interest in order to pass the balancing test in *Burdick*.

### b. Absentee Voting

As described in detail in his previous brief, absentee voting also fails to relieve the burdens imposed on Mr. Valenti by barring him from voting at the High School. (Pl.'s Summ. J. Br. 6-8.) Both voting by mail and in person at the county clerk's office would require him to vote early, which as the Seventh Circuit noted in *Griffin*, would "deprive[ ] [him] of any information to [his] vote that surfaces in the late stages of the election campaign." *Griffin*, 385 F.3d at 1131. Both methods of voting would also deprive Mr. Valenti the ability to meet candidates and voters, the large majority of which vote and gather on an election day.[6] And both methods of voting would deprive Mr. Valenti the opportunity to celebrate his right to vote on an election day by voting with his community, an opportunity that many, including the plaintiffs in *Veasey*, F. Supp. 3d at 676-77, find to be an important part of voting. Absentee voting by mail also poses many administrative burdens that the Seventh Circuit and other courts have found to be burdensome on the right to vote. *See Griffin*, 385 F.3d at 1131; *Common Cause/Georgia v.*

---

[6] The State, pointing to an article that reports an uptick in early voting in Blackford County, implies that Mr. Valenti will have the same opportunities voting absentee that he would have on an election day to converse with local voters and candidates. (Defs. Response Br. 12. (citing http://www.hartfordcitynewstimes.com/news/blackford-county-sees-uptick-in-earlyvoting-numbers/article_d4e3741c-9a11-11e6-bbef-eb615c7bd4b6.html (last visited Feb. 6, 2017). First, the article does not state whether the 600 voters who had voted by October 24, 2016 had voted in person or by mail. Second, given that absentee voting occurs over the course of a month, it is highly unlikely that on any given day, Mr. Valenti will have the number of voters or candidates that will be present at the High School on election day. The State's argument that Mr. Valenti will be visited at his home by local candidates and electioneers from the same local candidates who appear on an election day is similarly speculative and does not diminish the unique opportunity presented by an election day for meeting candidates and discussing politics with one's community.

*Billups*, 406 F. Supp. 2d 1326, 1364-65 (N.D. Ga. 2005).[7]  Voting absentee, either by mail or in person, does not lessen the significant burdens imposed on Mr. Valenti's and in fact introduce new ones.[8]

The State nonetheless argues that, despite the obvious differences, voting absentee by mail somehow cures all of the burdens imposed on Mr. Valenti by barring him from voting in person at the High School on an election day.  (Defs.' Response Br. 10-11.)  The State points to the fact that a third of Indiana voters vote absentee (including both by mail and in person), that courts have found absentee voting as a "convenient method of exercising the franchise," and that at least one state, Oregon, conducts all of its elections by mail.  (*Id.* (quoting *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 811 (1969)).  For many voters, including those committed to jails and prisons as were the inmates seeking access to a mail-in absentee ballot at issue in *McDonald*, voting absentee by mail may not only be more convenient, but is likely the only way they can exercise the franchise.  *See McDonald*, 394 U.S. at 803.  If Indiana had adopted a voting system like Oregon's where voting by mail was the only option, Mr. Valenti would likely not have a case.  But Indiana does allow for voting in person on an election day, specifically at the High School in Mr. Valenti's town, and the fact that two-thirds of Indiana

---

[7]     The State takes pains to distinguish *Griffin* and *Common Cause/Georgia* on the facts.  (Defs.' Response Br. at 8-10.)  To state the obvious, both cases dealt with different voting restrictions, namely limits on who could vote absentee and a requirement that all in person voters obtain a voter ID, so the balancing under *Burdick* will necessarily be different.  But at the first stage of the *Burdick* balancing test, where this Court is determining the existence and severity of burdens on the right to vote, the cases are certainly persuasive in that the deficiencies in absentee voting that Mr. Valenti alleges here are the same deficiencies noted by these two courts.  As detailed below, these significant burdens cannot be justified by the State, and, based on the facts of this case, the restriction on Mr. Valenti's ability to access his community polling place on an election day is unconstitutional.

[8]     The State counters that if Mr. Valenti does not want to vote earlier, "he may drive his Chevy Cavalier or ask another voter to give him a ride to the Montpelier Civic Center on Election Day," (Defs.' Response Br. 12.)  But this is simply replacing one deficiency (voting early) with another (lack of transportation and being forced to vote away from his community), and for the reasons stated above, voting at the Civic Center does nothing to diminish the significant burdens posed by Mr. Valenti's voting at the Blackford County High School.

voters continue to view voting on an election day as preferable to voting absentee, despite its alleged conveniences, is evidence of the value to voting in person on election day with one's community.[9]

The State cites the district court opinion in *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008), for the proposition that absentee voting by mail eliminates any burden on Mr. Valenti's right to vote. (Defs.' Response Br. at 11.) The State's reliance on *Rokita*, which examined standing, is misplaced. In *Rokita*, though stating that "[v]oting by absentee ballot instead of in person does not, *by itself*, constitute injury in fact," the court noted that "the Democrats have not presented any evidence to the Court that voting absentee would be an actual hardship for any of the Named Individuals" in the case and in fact several had voluntarily voted absentee before. *Rokita*, 458 F. Supp. 2d at 813 (emphasis added). But unlike the plaintiffs in *Rokita*, Mr. Valenti has introduced evidence of the substantial burden that he faces by being barred from voting in person with his community on an election day. These burdens must be justified by equally weighty state interests to survive scrutiny under *Burdick*.

Finally, the State makes the erroneous argument that the unlawful entry statute's burdens are less severe because "only" 6,122 people, the number of individuals on the State's sex offender registry, will potentially have their constitutional rights violated. (Defs.' Response Br. 18.) It goes without saying that there is nothing insignificant about 6,122 people potentially

---

[9] The State notes briefly that Mr. Valenti stated in his deposition that he voted absentee in the 2016 General Election. (Defs.' Response Br. 11). He testified that he did so because he was being held in county jail following a physical altercation with his brother. (Valenti Dep. 7-8, 22-23.) The fact that Mr. Valenti voted absentee because this was the only method by which he could vote while in jail proves nothing other than the fact that Mr. Valenti values his constitutional right to vote, regardless of the circumstances.

having their fundamental right to vote violated. The State bases its argument on a statement by the Seventh Circuit in *Crawford*, 472 F.3d at 952, that "the fewer the people harmed by a law, the less total harm there is to balance against whatever benefits the law might confer."[10] In affirming *Crawford*, the Supreme Court made no mention of this standard for determining the relevant burden under *Burdick*, and the idea that a violation of a constitutional right is less significant if fewer people are affected is counter to Supreme Court precedent in other contexts. In *Whole Woman's Health v. Hellerstedt*, -- U.S. --, 136 S. Ct. 2292, 2320 (2016), *as revised* (June 27, 2016), for example, the Court applied an analogous test that weighed the State of Texas's purported benefits of an abortion restriction against the burdens it imposed on women. There, the Court rejected the state's argument that the regulation was constitutional because "the women affected by [the relevant] laws are not a 'large fraction' of the Texan women of women of 'reproductive age.'" *Id.* Rather, the proper denominator is "the women for whom the provision is an actual rather than an irrelevant restriction." *Id.* Similarly here, the relevant denominator is not the total population of Indiana, as the State asserts, or even the total number of sex offenders, but rather the total number of sex offenders who have their local polling place in a school, and will by virtue of the challenged statute no longer be able to vote there. The State's argument has even less salience here where Mr. Valenti is not seeking to enjoin the challenged law in its entirety, but only as applied to him in the context of voting on election day. The burden on his right to vote is significant and it must be adequately justified by "sufficiently weighty" state concerns. *Crawford*, 553 U.S. at 191

---

[10]  Even if the State's burden analysis were correct, *Crawford* is readily distinguishable as the plaintiffs in that case had "not introduced evidence of a single, individual Indiana resident who will not be able to vote as a result of SEA 483 or who will have his or her right to vote unduly burdened by its requirements. *Crawford*, 553 U.S. at 187 (plurality decision) (quoting district court decision). Here, by the State's own evidence, the constitutional rights of 6,122 individuals are potentially affected by the challenged law.

## II. The State has no legitimate governmental interest in baring Mr. Valenti from the High School on an election day

The State has not put forth a legitimate state interest that is sufficiently weighty to justify the significant burden on Mr. Valenti's voting rights posed the challenged law's complete ban on his voting at the High School. Eschewing the traditional categories of scrutiny for a "more flexible standard," the Supreme Court requires that courts weigh "the character and magnitude of the asserted injury to the right protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interest put forward by the State as justification for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (internal quotations omitted); *see also One Wisconsin*, 2016 WL 4059222, at *25 (quoting *Crawford*, 553 U.S. at 190) ("[T]he court must weigh the burdens [imposed by the challenged provision] against the state's justifications for imposing them 'and then make the hard judgment that our adversary system demands.'") The review is therefore not a binary choice, as the State suggests, between strict scrutiny and rational basis. (*See, e.g.*, Defs.' Response Br. 3 ("Indiana Code § 25-42-4-14 is rationally related to [the protection of children] by keeping sex offenders out of our schools."), 17 (arguing that the "State's prohibition on sex offenders entering schools is rationally related to the protection of children located within those schools").) In fact, "traditional rational basis review" is not part of the *Burdick* balancing test at all. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1025 (9th Cir. 2016), *petition for cert. filed*. Rather, "[h]owever slight [the] burden [on voting rights] may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."). *Crawford*, 553 U.S. at 191 (plurality opinion) (internal citation and quotation omitted).

The State posits that the unlawful entry statute furthers the State's "substantial interest in protecting children from serious sex offenders." (Defs.' Response Br. 13) While this is certainly a compelling State interest as a general matter, the State must establish that it has a legitimate interest in protecting children from sex offenders who vote in school-based polling places, as this is the relevant voting restriction at issue in this case. In other words, Mr. Valenti is not seeking to enjoin this law's application to any other context.

To begin with, a school is a highly regulated place where members of the public cannot simply enter and wander the halls on a school day. Schools often have strict check-in procedures and their own security guards. This is why the court in *Valenti v. Hartford City, Indiana*, examining a local ordinance that prevented Mr. Valenti from entering school property, concluded that "no reasonable person would think" allowing Mr. Valenti's entry into his daughter's school to meet with teachers would "create a threat to children or to public safety." No. 1:15-cv-63-TLS, 2016 WL 7013871, at *8 (N.D. Ind. Dec. 1, 2016).

The school becomes an even more regulated environment on an election day when government officials take over a designated area, in this case the Blackford County High School Auxiliary Gym, to establish a polling place. Children are not permitted in polling places unless they are accompanied by adult voters, Indiana Code § 3-11-8-15(a), and electioneering may not occur within 50 feet of the entrance to the polling place, *id.* §§ 3-5-2-10; 3-11-8-16. The risk to children of being solicited by sex offenders while in school is low to begin with, but on election day it is virtually non-existent.[11]

---

[11] The State contends that Mr. Valenti could use the conversations he might have "outside the polling location or somewhere else on school property" as an opportunity to solicit children. (Defs.' Response Br. 17.) But for the same implicit reasons the Northern District court found it fanciful to believe that Mr. Valenti's attendance at his child's parent-teacher conference posed a risk to children, the danger to children on an election day on school grounds is extremely low. To the extent there is some de

With no specific threat to children posed by Mr. Valenti voting on an election day at the High School, the State falls back on the same generalities that have supported state registration requirements and other restrictions on sex offenders in other contexts. (Defs.' Response Br. 13-14.) But courts have become increasingly skeptical where the general governmental interest in child safety are not specifically furthered by the regulations at issue. (*See* Pl.'s Summ. J. Br. 18-19 (and cases cited therein.) In any event, the cases the State cites have no applicability here. In *Weiss v. Indiana Parole Bd.*, the Indiana Court of Appeals examined whether the parole board was authorized under an Indiana statute to impose certain restrictions normally applied to sex offender, none of which are relevant to this case, to a person who was not convicted of a sex offense. 838 N.E.2d 1048, 1051 (Ind. Ct. App. 2005). The case was strictly a question of statutory interpretation and there was no discussion of the state's interest in protecting children and whether the Indiana statute furthered that interest. *Id.* At issue in *Doe v. City of Lafayette, Indiana* was a City ban on a single sex offender from entering the City's parks. 377 F.3d 757, 773 (7th Cir. 2004). The sex offender was "by his own admission . . . a sexual addict with a proclivity toward children," with "a long history of arrests and convictions for sexually related crimes" against children, and had recently been seen "cruising parks and watching young children." *Id.* at 758-59. The court had little difficulty finding that this particular individual posed a risk to children in parks, and that the ban at issue was narrowly tailored to that end. *Id.* at 773-74. Here, the State makes little effort to articulate the risk to children in terms of Mr. Valenti, who was convicted almost 24 years ago and has not been convicted of any other sex offense since, or in terms of the particular situation at issue here—the risk to supervised and accompanied children at a school on an election day. *Doe* is inapplicable.

---

minimis risk, it is far less than any of the non-regulated areas where unattended children are present, including shopping malls, grocery stores, and libraries.

Finally, the State cites *McVey v. State*, an as applied challenge to Indiana Code § 35-42-4-14 under the Indiana Constitution's *ex post facto* clause. 56 N.E.3d 674 (Ind. Ct. App. 2016). In *McVey*, the plaintiff sought to enter a school to take a commercial driver's license course that was likely offered at other locations. *Id.* at 681. The *ex post facto* analysis, either under the Indiana or Federal Constitutions, in part, looks at the effect of the law on Mr. McVey was excessive in light of the State's non-punitive goals of protecting children. *Id.* at 680. In a narrow decision based on the specific facts of that case, the court found that the restraint on Mr. McVey, his inability to take a driving course at a particular location, was relatively minor in relation to the state's general interest in protecting children. *Id.* at 681. The court did not examine the effectiveness of the ban in terms of protecting children because that analysis was not required in light of the exceedingly low interest Mr. McVey had in being on school property in the first place. In the voting rights context, *McVey* is analogous to *Crawford*, where the plaintiff failed to offer any evidence of a burden on an individual's voting rights. *Crawford*, 553 U.S. at 187 (plurality opinion). The State nonetheless argues that this as applied *ex post facto* case is more applicable than *Valenti v. Hartford City*, which involved, albeit, a local ordinance that imposed the exact same restraint at issue here (the inability to enter a school) on the exact same plaintiff (Mr. Valenti). That court, familiar with Mr. Valenti's particular circumstances, found that he did not pose a reasonable risk to children when entering school to meet with his daughter's teachers. 2016 WL 7013871, at *8. The threat to child safety is even less reasonable where Mr. Valenti is entering school property on an election day when an already regulated environment is even more secure. *McVey* is neither applicable on the law or the facts, and does nothing to elucidate a legitimate state interest under the circumstances of this case.

**III.** **The significant burdens on Mr. Valenti's voting rights posed by the unlawful entry statute far outweigh any legitimate State interest and under *Burdick*'s flexible standard, the law is unconstitutional**

For the reasons stated above, the State has no interest in protecting children from sex offenders who vote in school-based polling places because no danger exists. Under *Burdick*, this ends the inquiry since there is nothing to weigh against the significant burdens the unlawful entry statute imposes on Mr. Valenti. But even assuming the statute advances some interest in child safety, however small the effect, prohibiting Mr. Valenti from voting at his polling place on school property is "excessively burdensome," *see Crawford*, 553 U.S. at 202 (plurality opinion) (quoting *Storer v. Brown*, 415 U.S. 724 (1974)), and it certainly is not "necessary to burden" Mr. Valenti's voting rights to protect children, *see Common Cause Ind.*, 800 F.3d at 921. *See also Tripp v. Smart*, No. 14-CV-0890-MJR-PMF, 2016 WL 4379876, at *8 (S.D. Ill. Aug. 17, 2016), *appeal filed* (citing *Hall v. Simox*, 766 F.2d 1171, 117 (7th Cir. 1985) ("[I]f there is a lesser restriction that protects most of the state's interest than the state's decision to impose a far greater restriction could suggest a lack of reasonableness on the state's part.").

As stated in previous briefings, the State already has laws on the books that address the State's interest in child safety, and they certainly serve as a powerful deterrent to people have sex offense records and are already under close scrutiny. *See* Indiana Code § 35-42-4-6 (prohibiting child solicitation); Indiana Code § 35-42-4-13 (prohibiting communication with minors concerning sexual activity). In light of the excessiveness of the statute, the burdens imposed on Mr. Valenti's right to vote far outweigh any potential benefit to child safety, and the unlawful entry statute, therefore, cannot be justified under even the lower end of *Burdick*'s test.

If the statute is not rational and does not meet the sliding-scale approach to scrutiny under *Burdick*, it certainly does not pass the strict scrutiny applied to severe burdens, where the statute

must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. As detailed in Mr. Valenti's previous brief, the statute here fails narrow tailoring in that it is both overinclusive, in that it captures a great deal of benign activity (*e.g.*, voting, attending parent-teacher conferences) while leaving unaddressed polling places not located on school property, such as libraries and community centers, where plaintiffs would have just as much, if not more incidental contact with children. In his previous brief, Mr. Valenti cited *Does I-IV v. City of Indianapolis*, where the court struck down a law that prohibited sex offenders from, among other things, being 1,000 from a school that could serve as a polling place, and *Doe v. Prosecutor, Marion County, Indiana*, where the court struck down a law prohibiting sex offenders from accessing social networking, as examples of similarly broad restrictions on sex offenders that were not sufficiently tailored to the state's objective of protecting children. (*See* Pl.'s Summ. J. Br. 20-22 (citing *Does I-IV v. City of Indianapolis*, No. 1:06-cv-865-RLY-WTL, 2006 WL 2927598 (S.D. Ind. Oct. 5, 2006); *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694, 695 (7th Cir. 2013).)

In attempting to distinguish this case from *Does I-IV*, the State argues that the statute here is narrowly tailored because, unlike the ordinance at issue in *Does I-IV*, the unlawful entry statute allows serious sex offenders to vote by mail-in absentee ballot. (Defs.' Response Br. 19-20.) But this is not narrow tailoring—the law is still overinclusive in that it unnecessarily bans legitimate activities on school property, in this case voting. The absentee voting option, while relevant to the State's argument that Mr. Valenti is not burdened by the statute, does nothing to solve the unlawful entry statute's overinclusiveness.

The State's attempt to distinguish *Doe v. Prosecutor*, and reliance on *Hill v. Colorado*, 530 U.S. 703 (2000), are unpersuasive. (Defs.' Response Br. 20-21.) In *Hill*, plaintiffs

challenged on First Amendment grounds a law prohibiting protest within 100 feet of a healthcare facility to shield abortion patients from potentially traumatic encounters with protesters. *Hill*, 530 U.S. at 707. The Court found that although the law was overinclusive in that it would restrain some "demonstrator[s] whose approach in fact would have proved harmless," fashioning a rule that could accurately assess "harassing or not harassing" behavior was administratively unfeasible. *Id.* at. at 729. But *Hill* does not apply here because the State could easily "carv[e] out a rule that covered precisely the evil contemplated by the legislature." 530 U.S. 730 First, the State could do exactly what the Court in *Doe* suggested to narrowly tailor the state's blanket ban on social media for registered sex offenders, which was to enforce the child solicitation laws already on the books. *Doe*, 705 F.3d at 700 (citing Indiana Code § 35-42-4-6 (prohibiting child solicitation); Indiana Code § 35-42-4-13 (prohibiting communication with minors concerning sexual activity)). The State could also provide an exception for voting or other legitimate activities, while maintaining its general prohibition on sex offenders entering school property. Other states have done just that. For example, Idaho Code § 18-8329 makes it a criminal offense for registered sex offenders to enter school property when children are present, but provides an exception for voting and for parents. *See id.* § 18-8329(2). North Dakota similarly prohibits sex offenders from accessing school property, but provides an exception for, voting and for parents. N.D. Cent. Code § 12.1-20-25. Indiana's law provides no exceptions. Because the law is both overinclusive and underclusive, it fails narrow tailoring and would not meet strict scrutiny under *Burdick*.

**Conclusion**

Indiana Code § 35-42-4-14's blanket ban on Mr. Valenti's entering school property imposes unjustified burdens on Mr. Valenti's fundamental right to vote that cannot be justified

by any legitimate state interest. Under *Burdick*, the law fails even the most deferential scrutiny, and it certainly fails the narrow tailoring required here. There are no contested issues of material of fact and an injunction must issue so that Mr. Valenti can vote in person on an election day together with the members of his community.

s/ Jan P. Mensz
Jan P. Mensz
Kenneth J. Falk
Gavin M. Rose
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
jmensz@aclu-in.org
kfalk @aclu-in.org
grose@aclu-in.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby verify that on this 8th day of February, 2017, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system:

    Betsy Isenberg
    Deputy Attorney General
    Betsy.Isenberg@atg.in.gov

    Christopher Farrington
    Deputy Attorney General
    Christopher.farrington@atg.in.gov

                /s/ Jan P. Mensz
                Jan P. Mensz
                Attorney at Law